THE STATE OF OHIO, APPELLEE, v. NOSIS, APPELLANT.

[Cite as State v. Nosis (1969), 22 Ohio App. 2d 16.]

(No. 6304—Decided June 4, 1969.)

*Mr. James V. Barbuto,* prosecuting attorney, and *Mr. Stephan H. Gabalac,* for appellee.

*Mr. Ralph W. Ross,* for appellant.

DOYLE, J. The appellant, James Nosis, was indicted by the Grand Jury of Summit County on the charge of

manslaughter in the first degree, in violation of Section 2901.06, Revised Code. A plea of not guilty was entered, and he was tried before a Judge of the Court of Common Pleas. At the conclusion of the trial, he was adjudged guilty and sentenced to the Ohio State Penitentiary. He had formally waived a trial by jury, pursuant to the statute.

In the appeal to this court, in which a reversal of the judgment is sought, errors are assigned as follows:

1. "The trial court erred in overruling a motion to dismiss the charges contained in the indictment for reason that the state had failed to addend in its opening statement any allegations which constituted a violation of Section 2901.25 of the Revised Code of Ohio."

2. "The trial court erred in overruling a motion for a directed verdict in favor of the defendant for reason that the state had failed to prove by any degree of proof the allegations of the indictment herein."

3. "The trial court erred in overruling an objection to a hypothetical question put to the state's expert witness, Dr. Rocco Antenucci, for reason that said hypothetical question was prejudicial to the rights of this defendant and contrary to law."

4. "The verdict and judgment of the court is against the manifest weight of the evidence and contrary to law of the state of Ohio."

The manslaughter charged in this case by the state of Ohio culminated from a claimed wrongful death proximately caused by a claimed violation of Section 2901.25 of the Revised Code by the appellant.

That Code section, insofar as pertinent, appears as follows:

"No person shall assault or threaten another in a menacing manner * * *.

"Whoever violates this section shall be fined not more than two hundred dollars or imprisoned not more than six months, or both."

The events giving rise to this action occurred on March 22, 1968. The evidence shows that on that date Charles Ripple (the deceased) and his wife, with the hus-

band driving, were proceeding, in their automobile, on one of the main highways in Akron, and, while ascending a moderate grade in the highway, they passed, on the left, a car ahead being operated by the appellant, Nosis. While passing, Charles Ripple blew his horn several times to warn of his intention to proceed ahead. He then traveled for several blocks until he stopped for a traffic light. At this moment, Nosis stopped his car directly behind the Ripple car, and, according to the testimony of Mrs. Ripple, he "jumped out of his car and ran up and pulled my husband's car door open and wanted him to fight.

"Q. And when he wanted him to fight, what did you do, if anything? A. I leaned over the steering wheel and told him to leave my husband alone because he had a bad heart.

"Q. What happened at that time? A. He continued arguing, and when the light changed my husband left the clutch out, and we turned around the corner and went on home."

The evidence indicates that the appellant, Nosis, followed the Ripple car for several miles on the highways and then into the driveway of the Ripple home. Mrs. Ripple testified as to events at this juncture:

"Q. Now, what happened as you got out of the car? A. We got out of the car, and we saw that Mr. Nosis was coming toward us.

"Q. * * * Would you describe the way he acted? A. He was very angry, and he had his voice pitched and had his hands up like he was coming at my husband. I had every intention of feeling that he was going to strike my husband if it was at all possible. * * * I was frightened for my husband. I said, 'I'm going in and call the Sheriff,' and I did so.

"Q. Would you tell us where your husband was standing while you were being threatened by Mr. Nosis? A. He had taken approximately one step out of the garage.

"Q. * * * Now, did you see anything in either hand at that time? A. I did not.

"Q. Now, was Mr. Nosis using any specific language?

A. He was cursing. I can't recall just exactly the words that he said.

"Q. But you remember them as being curses? A. That's right.

"Q. Did you then go into the house? A. I did.

"Q. And did you in fact call the Sheriff? A. I called the Sheriff.

"Q. What did you then observe? A. I told them what his license number was, and that he was trying to make trouble for my husband, and I needed help. And I started to hang the receiver up, and I looked out the window and seen my husband laying on the driveway. And I screamed back into the receiver for them to send an ambulance, that he had had a heart attack.

"Q. What did you do then? A. I dashed out the door to him, and he was gone.

"Q. When you say he was gone, to whom are you referring, Mr. Nosis? A. Mr. Nosis was gone, and my husband was dead.

The evidence further shows that in the driveway of the Ripple home Charles Ripple said to the appellant: "I've got a bad heart. Leave me alone." This constituted, according to the evidence, a second warning to the appellant of the physical condition of Charles Ripple.

Dr. Rocco Antenucci, a medical doctor, licensed to practice in the state of Ohio, testified that he had had the deceased as a patient since 1963, and that he had an arteriosclerotic heart disease. In 1965, his condition had worsened, and he was advised to retire from work and to avoid "exertion, both physical and emotional."

As a part of the examination of the doctor, a hypothetical question was propounded, which included a statement of the events as heretofore related and including the report of the Coroner's autopsy. He was asked: "Now, assuming all of these facts to be true, do you have an opinion with reasonable medical certainty as to the probable cause of Mr. Ripple's death?" The doctor answered: " * * * that these events with reasonable certainty were responsible for Mr. Ripple's demise"; that "these events that oc-

curred, at the time they occurred, regarding his condition prior to this, that when you put the two things together, that these events with reasonable certainty were responsible for his death."

It appears from the above, and from other parts of the record, that the expert testimony was sufficient for a conclusion, with reasonable medical certainty, that the facts as related to the witness in the hypothetical question, brought upon the fatal heart attack at the time of death.

The law is established that "unlawful killing, as used in manslaughter, must be such as would naturally, logically and proximately result from the commission of some unlawful act as defined by statute, and such unlawful act must be one that would be reasonably anticipated by an ordinarily prudent person as likely to result in such killing." *Black* v. *State,* 103 Ohio St. 434.

As we read the record before us, we find the facts established to be sufficient for the trier of the facts to have found, beyond a reasonable doubt, that the appellant assaulted the deceased, in violation of Section 2901.25, Revised Code, and that such assault proximately caused the death of the deceased.

We further find that the evidence is sufficient to establish the requirements for conviction set forth in the *Black case, supra.*

In consideration of the several assignments of error, we find them not to be established. The judgment will be affirmed.

*Judgment affirmed.*

HUNSICKER, P. J., and BRENNEMAN, J., concur.