OPINION
{¶ 1} Defendant-Appellant, Marsha A. Shoemaker, appeals the judgment of the Union County Court of Common Pleas, convicting her of, among other things, one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree, and one count of deception to obtain a dangerous drug in violation of R.C. 2925.22(A), a felony of the fourth degree. On appeal, Shoemaker argues that the trial court failed to grant her Crim.R. 29 motion of acquittal on the counts of involuntary manslaughter and deception to obtain a dangerous drug. Finding that the trial court properly denied Shoemaker's Crim.R. 29 motion on the counts of involuntary manslaughter and deception to obtain a dangerous drug, we affirm the judgment of the trial court.
 {¶ 2} In November of 2005, the Union County Grand Jury indicted Shoemaker on one count of deception to obtain a dangerous drug in violation of R.C. 2925.22(A), a felony of the fourth degree; one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(1)(c), a felony of the third degree; one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree; one count of aggravated possession of drugs in violation of R.C.2925.11(A), (C)(1)(b), a felony of the third degree; and, one count of complicity to aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(b), a felony of the third degree. At her arraignment, Shoemaker entered a plea of not guilty to all five counts in the indictment.
 {¶ 3} In March of 2006, a jury trial was held. At the trial, the following testimony was heard.
 {¶ 4} Chance Runyon testified that he had a party at his parents' house on July 1, 2005, while his parents were vacationing in Montana. Chance noted that Justin Phelps attended the party with approximately ten to fifteen other people. Chance continued that when Justin arrived at his parents' house, he had a twelve pack of beer, some marijuana, and an orange pill bottle, which Justin said contained Percocet and Xanax, with him. Chance testified that Justin had also informed him that he was trying to get morphine prior to the party, but Justin did not state where or from whom he was going to try to obtain the morphine.
 {¶ 5} Christopher Shoemaker, Shoemaker's son, who also was at Chance's party, testified that the first time he saw Justin at the party, Justin was drinking beer. Christopher continued that later in the evening, he saw Justin with marijuana and pills. Christopher noted that he smoked marijuana with Justin and that Justin had given him morphine pills, which were blue and white; however, he refused to take the morphine pills. Additionally, Christopher testified that he saw Justin take a morphine pill and a Percocet pill. Christopher noted that when he left the party, Justin appeared to be "pretty buzzed up" and "was intoxicated", but did not notice anything physically wrong with him. (Trial Tr. p. 98).
 {¶ 6} Gordy Wolfe was also called to testify. Mr. Wolfe testified that on July 1, 2005, Justin had stopped by his home to pick up a CD and that Justin had told him that he was going to try morphine at Chance's party, but he did not ask Justin about where or from whom he was going to obtain the morphine.
 {¶ 7} Ashton Kidd, who was at Chance's party from approximately 9:30 p.m. to 1:00 a.m., testified that at the party, he saw Justin with purple and white pills, which Justin told him contained morphine, but he did not know where Justin obtained the pills. Mr. Kidd also testified that Justin had offered him some of the pills, which Justin had in a bag that contained approximately twenty to thirty pills.
 {¶ 8} Kyle Emmens, who was also at Chance's party, testified that he saw Justin with a bottle of pills, which contained blue and white pills; that he saw Justin take two of the blue and white pills but did not know how many or what kind of pills Justin took; and, that he saw Justin drinking alcohol.
 {¶ 9} David Wampler, who is Chance's neighbor and attended the party, testified that he saw Justin with purple and white pills, which Justin stated were morphine, but noted that Justin did not tell him where, when, or how he obtained the morphine pills. Mr. Wampler also testified that he did not see Justin take any of the pills; however, Mr. Wampler did recognize that in his written statement to police, he indicated that he saw Justin take one or two of the purple and white pills.
 {¶ 10} Lindsey Webb, who had previously dated Justin for approximately three years and attended Chance's party, testified that when she arrived at the party, "[Justin] was drinking, obviously. He had a beer in his hand, but other than that, he wasn't slurring no (Sic.) words or incoherent or anything." (Trial Tr. p. 191). Ms. Webb also noted that she stayed with Justin that night and went to bed at around 4:00 to 4:30 a.m., and agreed that Justin's condition showed that "he had been drinking but [didn't] appear to be overly intoxicated." (Trial Tr. p. 192).
 {¶ 11} Ms. Webb testified that at around 9:30 a.m. on July 2, 2005, she was woken up by Chance, who was yelling at Justin to wake him up. Ms. Webb continued that at this point, Justin was snoring and described his snoring as "loud." (Trial Tr. p. 193). Ms. Webb also noted that she did not pay any attention to whether Justin was making breathing sounds and went back to sleep.
 {¶ 12} Chance testified that on the morning of July 2, 2005, at around 10:00 a.m., Justin was found having difficulty breathing; that he was unable to find Justin's pulse; that Justin "didn't really look like he was breathing"; that Justin's "lips were kind of purple"; that Ms. Webb, who also spent the night at Chance's house, called 9-1-1 and later, he talked to the dispatcher; and, that Adam Slack, who did not spend the night at his parents' house, commenced CPR on Justin before medics arrived. (Trial Tr. p. 154).
 {¶ 13} Deputy Tina Perry, the 9-1-1 dispatcher at the Madison County Sheriff's department who received Ms. Webb's call, testified that she dispatched medics and Deputy Brent Michael to the scene.
 {¶ 14} Deputy Michael, a deputy sheriff with the Madison County Sheriff's Department, testified that Justin's yellow Aztec was parked outside of the residence and that when he got to the residence, medics were already working on Justin.
 {¶ 15} Dr. Victor Trianfo, the assistant director of emergency services at Memorial Hospital of Union County, testified that he was serving in the emergency room on July 2, 2005, when Justin was admitted into the emergency department of Memorial Hospital. Dr. Trianfo stated that on Justin's arrival to the emergency room, CPR had already been instituted and that "[Justin's] condition was quite grave." (Trial Tr. p. 164). Dr. Trianfo indicated that after eleven minutes of resuscitative efforts, the efforts were discontinued.
 {¶ 16} Dr. Trianfo also testified that he had taken blood specimens from Justin's body that included both THC, which is more commonly known as marijuana, and opiates. Dr. Trianfo continued that morphine was a class of opiate and that the drug screen performed on Justin's blood would have picked up morphine. Dr. Trianfo also stated that "[Justin's] condition upon presentation was consistent with a drug overdose, and, indeed, that was my diagnosis and impression at the time I saw him." (Trial Tr. p. 168).
 {¶ 17} On cross-examination, Dr. Trianfo stated, with regards to the test performed on Justin's blood, that "morphine and all of its congeners [and] [m]edications such as Percocet [and] Percodan could also be found in the system under the general classifications of opiates." (Trial Tr. p. 173-74).
 {¶ 18} On recross-examination, Dr. Trianfo confirmed that the test on Justin's blood indicated that there was a presence of an opiate, but did not distinguish which opiate was in his blood.
 {¶ 19} Dr. David Applegate, the Union County Coroner, testified that he conducted an investigation into the death of Justin Phelps. Dr. Applegate stated that he had Justin's body transported to the Licking County Coroner's Office, where an autopsy of Justin's body was completed, because his office did not have the facilities to complete a forensic autopsy. Additionally, Dr. Applegate testified that he reviewed all of the materials from the Licking County Coroner's Office and had extensive discussions with Detective Justice and the Union County Sheriff's Office in making his determination.
 {¶ 20} After reviewing his coroner's report, Dr. Applegate testified that he determined with a preponderance of the evidence that Justin died because of an accidental acute morphine overdose. Dr. Applegate continued that he based his determination on the toxicology and timing of Justin's death and that his determination was made with a reasonable degree of medical certainty. Dr. Applegate also stated that small beads found inside Avinza capsules were found in Justin's esophagus and stomach contents. Dr. Applegate continued that alcohol will typically speed up the release of Avinza and helped lead to a sudden overdose. Dr. Applegate also testified that Justin had metabolites of marijuana and low levels of "Oxycodone, which can be with the [trade] names of Percocet, Percodan, [and] Endocet * * *." (Trial Tr. p. 301). Dr. Applegate concluded that neither Oxycodone nor marijuana was a contributing factor to Justin's death.
 {¶ 21} Dr. Applegate also testified about how an overdose of morphine affects a person's body. Dr. Applegate noted that a high level dose of morphine can suppress "the breathing mechanism and that's what we felt caused the death in Justin." Dr. Applegate also stated that brain swelling and frothing of the airways are found in victims of morphine overdoses, which they found in Justin's body.
 {¶ 22} After being asked by the jury, Dr. Applegate testified that he believed Justin died between 6:00 and 9:00 on the morning of July 2, 2005. Additionally, Dr. Applegate noted that his belief was inconsistent with the witnesses who found Justin snoring and that "[he] did not believe that [Justin] had been alive just an hour or two before he presented Sic. to the emergency department." (Trial Tr. p. 323).
 {¶ 23} Dr. Charles Lee, the chief forensic pathologist and a deputy coroner at the Licking County Coroner's Office in Newark, Ohio, testified that he performed the autopsy on Justin's body on July 4, 2005. Dr. Lee noted that Justin's body was very healthy and normal, except that his brain was swollen and his lungs were very heavy and filled with fluid. Additionally, Dr. Lee stated that he found little white balls, which are found in a time released medication, in the uppermost portion of Justin's airway and in Justin's gastrointestinal tract. Dr. Lee also indicated that Justin's toxicology report showed that his blood had approximately seven to eight times the level of the therapeutic range of morphine. Finally, Dr. Lee concluded that his opinion with a reasonable degree of medical certainty was that Justin died of acute morphine overdose.
 {¶ 24} On cross-examination, Dr. Lee noted that Justin's case was "the highest level I've ever seen of morphine in a death." (Trial Tr. p. 342). Additionally, Dr. Lee stated that he did not analyze the little white balls found in Justin's body.
 {¶ 25} Sergeant Eric Semler, with the Madison County Sheriff's Office investigation division and assigned to the Drug Enforcement Administration, federal task force, testified that on the morning of July 2, 2005, he was called out to Chance's parents' residence for an investigation. Sergeant Semler noted that when he arrived at the scene, Justin had already been transported to the hospital. Sergeant Semler continued that Chance had informed him that he believed that Justin had smoked "a little marijuana" and that he thought "[Justin] had maybe taken some morphine tablets." (Trial Tr. p. 67). Sergeant Semler testified that after he received this information from Chance, he had Deputy Michael inform the Union County Memorial Hospital.
 {¶ 26} Sergeant Semler and Deputy Michael participated in the inventory of Justin's vehicle, which was located at Chance's parents' house. Both Sergeant Semler and Deputy Michael noted that inside the vehicle a plastic bag containing blue and white capsules and other drug paraphernalia were found. Sergeant Semler continued that these items were submitted to the Bureau of Criminal Identification and Investigation (hereinafter referred to as "BCI"), and Deputy Michael noted that these items were seized as evidence. Sergeant Semler also indicated that he obtained Justin's cell phone, some cash, and a pack of cigarettes.
 {¶ 27} Erica Reed, a forensic chemist at BCI, identified the items Sergeant Semler submitted to BCI. Ms. Reed testified that the items included a clear plastic bag containing 121.20 grams of marijuana, a clear plastic bag containing nineteen blue and white capsules of morphine, thirteen white tablets of Oxycodone, three blue tablets of Alprazolam, one white tablet of Hydrocodone, and six tablets of Lorazepam.
 {¶ 28} Christopher Shoemaker also testified that he gave a statement to Detective Justice on July 5, 2005. Christopher stated that he told Detective Justice that Justin had morphine and that his mother, Shoemaker, had been prescribed morphine for back pain. Christopher continued that his mother also occasionally used marijuana; however, he did not know everyone she got it from. Christopher testified that Justin told him that he had given his mother marijuana. Christopher also noted that he had heard conversations between his mother and Justin, during which Justin wanted to trade marijuana for morphine. Christopher also noted that he knew that Justin and his mother were exchanging marijuana for morphine and that he was present for one discussion of an exchange, but never actually witnessed an exchange take place.
 {¶ 29} On cross-examination, Christopher testified that he heard that Justin had more pills than just the Percocet and morphine, but only saw Justin with those two types of pills. Christopher also testified that Shoemaker kept her morphine in her room or in her medicine cabinet; however, the morphine was not locked up.
 {¶ 30} On redirect examination, Christopher stated that he was between a rock and a hard place because his friend was dead and his mother provided him with the drugs. Additionally, Christopher confirmed that he told Detective Justice that his mother was providing Justin with morphine in exchange for marijuana.
 {¶ 31} Dr. Scott Murray, Shoemaker's physician, testified that she had come to his office for the first time in February of 2003. Dr. Murray continued that at this visit, Shoemaker noted that she had a lower back injury in 1999 while working cleaning houses. Dr. Murray noted that Shoemaker had undergone surgery in 2002 and 2004 for her lower back. Dr. Murray indicated that between 2003 and 2004, he treated Shoemaker's condition with therapy, antiinflammatory medications, and some other medications to lower her muscle pain.
 {¶ 32} Dr. Murray stated that he prescribed Shoemaker 60-milligram Avinza capsules, a long-acting morphine medication, for the first time in February of 2005. Dr. Murray also noted that he refilled her prescription for 60-milligram Avinza capsules in March and April of 2005. Dr. Murray continued that in May of 2005, he increased Shoemaker's Avinza dosage from 60-milligrams to 90-milligrams and that in June of 2005, he increased Shoemaker's Avinza dosage from 90-millgrams to 120-milligrams.
 {¶ 33} Karen Yee, a pharmacist at Kroger in Marysville, Ohio, testified that Kroger did not fill any prescriptions of 60-milligram Avinza for Shoemaker during June of 2005, but did fill Shoemaker's prescription for thirty capsules of 120 milligram Avinza on June 15, 2005, the same date Dr. Murray ordered the prescription. Ms. Yee also indicated that Shoemaker had signed a signature log indicating that she had picked up the prescription.
 {¶ 34} Ms. Yee also described the physical difference between the various milligram pills of Avinza. Ms. Yee stated that 120-milligram Avinza is blue on one side and white on the other side. Additionally, Ms. Yee identified the pills found in Justin's vehicle as Avinza 120-milligram capsules.
 {¶ 35} Dr. Murray also testified that "[Avinza] is different than most of the others in that it releases ten percent of the medication when the patient first takes it and spreads the rest of medication (Sic.) out over the course of 24 hours" (Trial Tr. p. 219) and that "a peak concentration of the medicine would be approximately six hours after the patient took the [Avinza capsule]." (Trial Tr. p. 220).
 {¶ 36} Dr. Murray also described his procedure before prescribing a patient medicine. Dr. Murray testified that he had his patients read over and sign a pain medication agreement in his office. Dr. Murray also indicated that Shoemaker signed a pain medication agreement in March of 2003.
 {¶ 37} Dr. Murray testified that within the pain medication agreement, the third paragraph read "I will not use any illegal controlled substances, including marijuana, cocaine, etcetera." (Trial Tr. p. 204). Dr. Murray also confirmed that if one of his patients were using marijuana or cocaine, it would cause him concern and would be something that he would consider before proscribing opiate narcotics. Dr. Murray noted that if someone used marijuana, it "lets [him] know that they have connections to the illegal drug market and so they are at risk; there certainly needs to be considerations on what medications I might feel comfortable for prescribing for them." (Trial Tr. p. 205).
 {¶ 38} Dr. Murray also stated that paragraph four of the pain medication agreement provided "I will not share, sell, or trade my medications with anyone." (Trial Tr. p. 205). Dr. Murray continued that "[d]iverting medications is one of the big concerns I have as a physician regarding the controlled pain medications, not wanting them to be taken by anyone other than the patient for the safety of people — other people in the community as well as the patient." (Trial Tr. p. 206). Additionally, Dr. Murray stated that if he found out that one of his patients was using marijuana, "[he couldn't] think of a condition where [he] wouldn't stop prescribing medications, controlled substances, to that patient and [would] most likely discharge them from [his] practice." (Trial Tr. p. 206).
 {¶ 39} Dr. Murray also testified that the seventh paragraph of the pain medication agreement provided, "I agree that I will use my medication at a rate no greater than the prescribed rate, and that the use of my medication at a greater rate will result in my being out of medication for a period of time." (Trial Tr. p. 207). Dr. Murray, describing the importance of this paragraph, stated "[w]hen I prescribe a medication to someone, that is the dose that I feel is appropriate for them at that time. A greater quantity of medication might be harmful to them, but it also may indicate that they don't have control over their ability to take the medication." (Trial Tr. p. 207).
 {¶ 40} Dr. Murray testified that the ninth paragraph of the pain medication agreement provided, "I agree to use only one pharmacy to fill my pain medication prescription." (Trial Tr. p. 207). Dr. Murray, describing the importance of this paragraph, stated "[i]t's very difficult to keep track of * * * prescriptions that are filled by patients. One of the ways that it decreases the work I have to do and my medical staff has to do is have only one pharmacy where each patient fills the prescriptions." (Trial Tr. p. 207).
 {¶ 41} Dr. Murray continued that the fifteenth paragraph of the pain medication agreement provided, "I understand that if I break this agreement my doctor will no longer prescribe controlled substances for me, and he may choose to no longer be my treating physician after 30 days of notification and my records will be forwarded to any physician I select for further care." (Trial Tr. p. 208).
 {¶ 42} Dr. Murray then confirmed that Shoemaker had never informed him that she had been using marijuana during the course of her treatment; that Shoemaker had never advised him that she had traded, sold, or shared her medication with anyone; that Shoemaker had never informed him that she had used more than one pharmacy to fill a pain medication prescription; and, that at times, Shoemaker used her medicine at a rate greater than the prescribed rate. Dr. Murray also indicated that on July 19, 2005, Shoemaker had informed him that she had taken twice her prescribed dosage of Avinza, during some days prior to her last appointment and had run out on July 5, 2005, when her prescription should have run out on July 15, 2005.
 {¶ 43} On cross-examination, Dr. Murray noted that while treating Shoemaker, he never questioned the legitimacy of her injury or pain; that he never felt deceived by Shoemaker; and, that there "were no red flags that made [him] think that [Shoemaker] was doing other (Sic.) than taking the medications as prescribed." (Trial Tr. p. 236).
 {¶ 44} Deanna Miracle, the payroll administrator at Fresh Encounter, the parent company of Community Markets in Marysville, Ohio, testified that Shoemaker was an employee of Community Markets and that Shoemaker came to work on July 1, 2005, but did not come to work on July 2, 2005.
 {¶ 45} Detective Michael Justice of the Union County Sheriff's Office testified that he and Sergeant Semler performed a joint investigation on this case. Detective Justice noted that as part of the investigation he received Justin's cell phone from Justin's father and had talked to Christopher Shoemaker. Detective Justice also stated that he obtained the cell phone records from Justin's phone, which included a phone call received from a pay phone at Community Markets at 1:52 p.m., on July 1, 2005.
 {¶ 46} Detective Justice also stated that he applied for a search warrant to conduct a search on Shoemaker's home, which the Marysville Municipal Court authorized. Detective Justice testified that he executed the search warrant on July 6, 2005. Detective Justice stated that while executing the search warrant and during a conversation with Shoemaker and her husband, Shoemaker affirmed that she received a prescription for Avinza on June 15, 2005. Additionally, Detective Justice stated that when he asked Shoemaker whether she had that prescription or if she had traded it with Justin, she denied that there was a trade. Detective Justice continued that Shoemaker had told him, without examining the pill bottle, that she was out of Avinza and that she had been taking two a day. Detective Justice also testified that he obtained a Kroger prescription bottle for thirty Avinza 120-milligram capsules for Shoemaker, but the bottle was empty. Detective Justice continued that after executing the search warrant on Shoemaker's residence, he and Sergeant Semler took Shoemaker to Memorial Hospital of Union County to take hair, blood, and urine samples from Shoemaker to determine whether Shoemaker had a presence or absence of morphine in her system.
 {¶ 47} Detective Justice also testified that he investigated pharmacies in Union County and noted that Shoemaker was the only person between January 1 and July 2, 2005 to obtain a 120-milligram Avinza prescription.
 {¶ 48} Detective Justice also reviewed Shoemaker's Grand Jury testimony, wherein she stated that she did not tell Dr. Murray that she had been using marijuana to help with pain; that she had double dosed her Avinza 120-milligram capsules because she hurt so bad; that she also double dosed on her Avinza 90-milligram capsules; that she had acquired marijuana from Justin; that she and Justin had discussed trading drugs for marijuana; that she did not know if anyone had stolen her pills, because she never counted them nor kept track of them; and, that she called Justin on July 1, 2005 to acquire some marijuana because she was out, but Justin did not have any. Additionally, Detective Justice noted that when asked "is your testimony under oath that you took every one of those Avinza 120s", Shoemaker responded "No." (Trial Tr. p. 396).
 {¶ 49} Dr. Laureen Marinette, the chief forensic toxicologist at the Montgomery County Coroner's Office and the Miami Valley Regional Crime Lab, testified that she reviewed and performed the toxicology studies on Shoemaker's blood and urine samples. Dr. Marinette indicated that the reports provided that a marijuana metabolite was found in Shoemaker's blood and urine samples; that the parent marijuana drug was found in her blood sample; that Amitriptyline, which is commonly known as Elavil, and Amitriptyline's metabolite Nortripyline were detected in her urine and blood samples; that diphenhydramine, which is commonly known as Benadryl, and Tramadol were found in the blood and urine samples. Dr. Marinette stated that morphine typically takes a couple of days to fall below the threshold for detection in a urine sample and up to a day for a blood sample depending on the dosage. Dr. Marineete also testified that tests were conducted on Shoemaker's blood and urine samples to detect morphine, but the tests did not detect morphine in either of her samples.
 {¶ 50} David Englehart, the lab director at Omega Laboratories in Mogadore, Ohio, testified that Omega Laboratories performed the hair testing on Shoemaker's hair sample. Mr. Englehart stated that the laboratory received Shoemaker's sample on August 24, 2005 and was taken from Shoemaker on July 6, 2005. Mr. Englehart testified that test results looking for morphine on Shoemaker's hair came back negative and that approximately seven to ten days after someone takes morphine, it should appear in that person's hair. Additionally, Mr. Englehart stated that Shoemaker's hair sample would provide results for ninety days of hair growth. Mr. Englehart added that when the laboratory completed further tests on Shoemaker's hair sample, the results showed that there was no morphine in her hair.
 {¶ 51} Mr. Englehart then testified that he received a second hair sample from Detective Justice on December 27, 2005 that was collected from Shoemaker on November 16, 2005, which would allow the laboratory to look back approximately one-hundred eighty days. Mr. Englehart testified that after the tests were performed on this hair sample, the results were positive for marijuana and opiates. Mr. Englehart continued that a confirmatory study was performed on this sample and that there was no morphine found within the one-hundred eighty day time period. Mr. Englehart also confirmed that if Shoemaker had been taking 120-or 90-milligram Avinza when she said that she was, Shoemaker's hair would have shown that she had actually consumed morphine.
 {¶ 52} Detective Justice also testified that Shoemaker was unable to offer an explanation as to why there was no morphine in her system; that she only saw Justin when she needed marijuana, which was about once a month; and, that she recognized that her doubling up on morphine would have been a violation of her pain agreement with Dr. Murray.
 {¶ 53} At the conclusion of the State's case-in-chief, Shoemaker moved under Crim.R. 29 for judgment of acquittal on all five counts of the indictment. The trial court granted the motion as to the count of aggravated possession of drugs, but overruled the motion on the other four counts.
 {¶ 54} Shoemaker did not present any witnesses or put on any evidence.
 {¶ 55} At the conclusion of the trial, a jury found Shoemaker guilty of one count of deception to obtain a dangerous drug in violation of R.C. 2925.22(A), a felony of the fourth degree; one count of aggravated trafficking in drugs in violation of R.C.2925.03(A)(1), (C)(1)(c), a felony of the third degree; one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree; and, one count of complicity to aggravated possession of drugs in violation of R.C.2925.11(A), (C)(1)(b), a felony of the third degree. The trial court also found that the offense of complicity to aggravated possession of drugs was an allied offense of aggravated trafficking in drugs, and the State elected to have Shoemaker sentenced on the aggravated trafficking offense.
 {¶ 56} Subsequently, the trial court sentenced Shoemaker to twelve months in prison on the count of deception to obtain a dangerous drug, five years in prison on the count of aggravated trafficking in drugs, and eight years in prison on the count of involuntary manslaughter, all to be served consecutively. The trial court also ordered Shoemaker to pay fines, costs, and restitution and credited her with one-hundred fifteen days of jail credit.
 {¶ 57} It is from this judgment Shoemaker appeals, presenting the following assignments of error for our review:
 Assignment of Error No. I THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT APPELLANT'SCRIMINAL RULE 29 MOTION OF ACQUITTAL ON THE COUNT OF INVOLUNTARYMANSLAUGHTER, AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TOSUSTAIN A GUILTY VERDICT.
 Assignment of Error No. II THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT APPELLANT'SCRIMINAL RULE 29 MOTION FOR ACQUITTAL ON THE COUNT OF DECEPTIONTO OBTAIN DANGEROUS DRUGS.
 Standard of Review {¶ 58} Because the assignments of error pertain to a trial court's denial of a Crim.R. 29 motion for acquittal, the following standard of review will be applicable to both assignments of error.
 {¶ 59} A motion for acquittal under Crim.R. 29(A) is governed by the same standard as one for determining whether a verdict is supported by sufficient evidence. See State v. Carter,72 Ohio St.3d 545, 553, 1995-Ohio-104; State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52. An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, para. two of the syllabus, superseded by state constitutional amendment on other grounds in State v. Smith (1997), 80 Ohio St.3d 89,1997-Ohio-355.
 {¶ 60} Crim.R. 29(A) provides:
Motion for judgment of acquittal. The court on motion of adefendant or on its own motion, after the evidence on either sideis closed, shall order the entry of a judgment of acquittal ofone or more offenses charged in the indictment, information, orcomplaint, if the evidence is insufficient to sustain aconviction of such offense or offenses. The court may not reserveruling on a motion for judgment of acquittal made at the close ofthe state's case.
 {¶ 61} Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt.State v. Bridgeman (1978), 55 Ohio St.2d 261. A motion for acquittal tests the sufficiency of the evidence. State v. Miley
(1996), 114 Ohio App.3d 738, 742. Sufficiency is a test of adequacy, Thompkins, 78 Ohio St.3d at 386, and the question of whether evidence is sufficient to sustain a verdict is one of law. State v. Robinson (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds in State v.Smith, 80 Ohio St.3d 89, 1997-Ohio-355.
 Assignment of Error No. I {¶ 62} In her first assignment of error, Shoemaker argues that her conviction on the count of involuntary manslaughter was not supported by sufficient credible evidence and that the trial court erred in denying her Crim.R. 29 motion for acquittal. Specifically, Shoemaker contends that she cannot be found guilty of involuntary manslaughter, because her conviction for trafficking in drugs in violation of R.C.2925.03(A)(1), (C)(1)(c), a felony of the third degree, cannot serve as the predicate felony offense of involuntary manslaughter. Basically, Shoemaker asserts that her drug trafficking conviction cannot be the proximate cause of Justin's death.
 {¶ 63} The Ohio Revised Code defines the offense of involuntary manslaughter in R.C. 2903.04. R.C. 2903.04 provides, in pertinent part:
(A) No person shall cause the death of another or the unlawfultermination of another's pregnancy as a proximate result of theoffender's committing or attempting to commit a felony.
 {¶ 64} In the case sub judice, Shoemaker argues that as a matter of law trafficking in drugs cannot be the predicate offense of involuntary manslaughter, because "[t]he State did not prove, beyond a reasonable doubt that while committing the offense of trafficking in drugs, [she] was the proximate cause of [Justin's] death." (Appellant's brief p. 4).
 {¶ 65} A description of the history of R.C. 2903.04 can be found in the Tenth District's decision of State v. Losey
(1985), 23 Ohio App.3d 93, 94-95. Within its Losey decision, the Tenth District described what the Legislature intended in its use of "proximate result" under R.C. 2903.04, as follows:
Under [R.C. 2903.04], defendant cannot be held responsible forconsequences no reasonable person could expect to follow from hisconduct; he will be held responsible for consequences which aredirect, normal, and reasonably inevitable-as opposed toextraordinary or surprising-when viewed in the light of ordinaryexperience. In this sense, then, "proximate result" bears aresemblance to the concept of "proximate cause" in that defendantwill be held responsible for those foreseeable consequences whichare known to be, or should be known to be, within the scope ofthe risk created by his conduct. State v. Chambers (1977),53 Ohio App.2d 266, 373 N.E.2d 393 [7 O.O.3d 326]. Here, that meansthat death reasonably could be anticipated by an ordinarilyprudent person as likely to result under these or similarcircumstances. See State v. Nosis (1969), 22 Ohio App.2d 16,457 N.E.2d 414 [51 O.O.2d 15].
Id. at 95.
 {¶ 66} In addition, the State had the burden to prove that Shoemaker caused Justin's death, and that the death proximately resulted from Shoemaker's commission of any felony, in this case, trafficking in drugs. See State v. Morris, 105 Ohio App.3d 552,556.
 {¶ 67} In the case sub judice, Shoemaker does not dispute her conviction of trafficking in drugs in violation of R.C.2925.03(A)(1), (C)(1)(c), a felony of the third degree. However, Shoemaker argues that Justin's death could not be the proximate result of her trafficking in drugs conviction. We disagree.
 {¶ 68} On the evidence presented in this case, reasonable minds could readily have concluded at the close of the State's case that Justin's death was proximately caused by Shoemaker giving her Avinza pills to Justin. Dr. Murray, Shoemaker's treating physician, testified that he had prescribed Shoemaker 120-milligram Avinza tablets for back pain on June 15, 2005. Karen Yee, a pharmacist at Kroger in Marysville, Ohio, testified that Kroger filled Shoemaker's prescription for thirty 120-milligram Avinza capsules on June 15, 2005; that 120-milligram Avinza capsules are blue on one side and white on the other side; and that the pills found in Justin's vehicle, which was found outside of Chance Runyon's parents' house, were 120-millgram Avinza capsules. Deanna Miracle testified that Shoemaker was an employee of Community Markets in Marysville, Ohio and came to work on July 1, 2005. Additionally, Detective Michael Justice testified that Justin's cell phone records included a phone call received from a pay phone at Community Markets on July 1, 2005. Further, Christopher Shoemaker, Shoemaker's son, testified that he knew that Justin and his mother were exchanging marijuana for morphine, but that he never actually witnessed an exchange take place. Christopher also testified that he saw Justin take a blue and white morphine pill at Chance's party on July 1, 2005. Also, two other witnesses testified that they saw Justin take blue and white pills, which Justin stated contained morphine, at Chance's party. Dr. Applegate, the Union County Coroner, testified that Justin's esophagus and stomach contained small beads found in Avinza capsules and that based upon a reasonable degree of medical certainty and with a preponderance of the evidence, Justin died of an accidental acute morphine overdose. Viewing the evidence in a light most favorable to the State, Justin's death, resulting from a morphine overdose, could have reasonably been anticipated by an ordinarily prudent person as likely to result from Shoemaker's trafficking in morphine, see State v. Baksi, 11th Dist. No. 98-T-0123, (The Eleventh District upheld a trial court's denial of a Crim.R. 29 motion on an involuntary manslaughter offense, where the defendant was convicted of trafficking in drugs for supplying the victim with heroin, which caused the victim's death.), and that any rational trier of fact could have found the essential elements of R.C. 2903.04(A) proven beyond a reasonable doubt. Accordingly, Shoemaker's first assignment of error is overruled.
 Assignment of Error No. II {¶ 69} In her second assignment of error, Shoemaker argues that her conviction on the count of deception to obtain dangerous drugs was not supported by sufficient credible evidence and that the trial court erred in denying her motion for acquittal, filed under Crim.R. 29. Specifically, Shoemaker asserts that because Dr. Murray did not feel deceived at any time when he was prescribing her the Avinza, the State failed to prove the essential element of deception.
 {¶ 70} The crime of deception to obtain a dangerous drug is defined in R.C. 2925.22. R.C. 2925.22 provides, in pertinent part:
(A) No person, by deception, as defined in section 2913.01 ofthe Revised Code, shall procure the administration of, aprescription for, or the dispensing of, a dangerous drug or shallpossess an uncompleted preprinted prescription blank used forwriting a prescription for a dangerous drug.
 {¶ 71} Deception is defined under R.C. 2913.01 as follows:
(A) "Deception" means knowingly deceiving another or causinganother to be deceived by any false or misleading representation,by withholding information, by preventing another from acquiringinformation, or by any other conduct, act, or omission thatcreates, confirms, or perpetuates a false impression in another,including a false impression as to law, value, state of mind, orother objective or subjective fact.
 {¶ 72} Here, it is undisputed that Shoemaker received a prescription for 120-milligram Avinza tablets in June of 2005, and that Avinza tablets contain morphine, a Schedule II controlled substance. Therefore, we are left to determine whether there was sufficient evidence to determine that Shoemaker obtained her Avinza tablets from Dr. Murray by deception. Shoemaker argues that since Dr. Murray believed that she needed the Avinza and did not feel deceived when prescribing the Avinza, the State failed to provide any evidence that would establish that she received the Avinza by deception. We disagree.
 {¶ 73} The definition of deception includes knowingly deceiving another by any false or misleading representation, by withholding information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another. R.C. 2913.01(A). Dr. Murray testified that Shoemaker signed an agreement wherein she was required to disclose any other medications that she was taking and to refrain from using any illegal controlled substances, including marijuana. When Shoemaker received the prescription for the 120-milligram Avinza capsules, she admitted that she had been using marijuana for at least three months and that she never informed Dr. Murray. Shoemaker also agreed to not use the Avinza prescriptions at a rate greater than prescribed; however, Shoemaker admitted that she used her 90-milligram Avinza tablets in a rate greater than prescribed prior to obtaining her 120-milligram Avinza prescription from Dr. Murray. Dr. Murray also testified that Shoemaker agreed not to divert prescription medication; however, a forensic examination of Shoemaker's hair showed that she had not used any of the morphine that she was prescribed within ninety days of July 8, 2005, but Shoemaker had received prescriptions for Avinza, informed Dr. Murray that she was taking the Avinza, and informed Dr. Murray of its effects on her. Also, during her Grand Jury testimony, Shoemaker admitted that she did not take every one of her 120-milligram Avinza pills; that prior to July 19, 2005, she never told Dr. Murray that she doubled up on her Avinza prescription; and, that she had been receiving marijuana from Justin for two to three months. Finally, Shoemaker could not explain why the forensic test results provided that she did not have morphine in her system.
 {¶ 74} Thus, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that Shoemaker received her prescription of 120-milligram Avinza tablets by deception; therefore, the essential elements of R.C. 2925.22 could have been proven beyond a reasonable doubt.
 {¶ 75} Accordingly, Shoemaker's second assignment of error is overruled.
 {¶ 76} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 Bryant, P.J. and Cupp, J., concur.