[Cite as *State v. Sabo*, 2010-Ohio-1261.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### UNION COUNTY

STATE OF OHIO,                                    CASE NO. 14-09-33

   PLAINTIFF-APPELLEE,

 v.

RICHARD H. SABO,                                 **O P I N I O N**

   DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 08-CR-84

Judgment Affirmed

Date of Decision:  March 29, 2010

APPEARANCES:

   *Richard s. Ketcham* for Appellant

   *David W. Phillips* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Richard H. Sabo (hereinafter "Sabo"), appeals the judgment of conviction entered against him by the Union County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This matter stems from the events that took place on or about June 19, 2007, when Sabo allegedly transported liquid methadone and other drugs to Union County, Ohio, where he shared them with another individual, Michael Mudgett (hereinafter "Michael"), who later died of an overdose of drugs. On July 16, 2008, the Union County Grand Jury indicted Sabo on three counts: count one, sale or offer to sell Methadone, Oxycodone and Tramadol, constituting aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(c)(1), a felony of the fourth degree with a forfeiture specification that a pick-up truck was used to commit or facilitate the commission of the offense; count two, involuntary manslaughter in violation of R.C. 2903.04, a felony of the second degree; and count three, aggravated possession of drugs in violation of R.C. 2925.11(A)(c)(1), a felony of the fifth degree.

{¶3} Sabo entered pleas of not guilty to the charges on October 10, 2008. On June 17, 2009, the State moved to amend count one of the indictment to remove any reference to Oxycodone and Tramadol. The motion was granted on the same day.

**{¶4}** A jury trial was held on June 17-18, 2009, and the following testimony was heard. Michael's mother and Sabo's sister, Jane Mudgett (hereinafter "Mudgett"), testified that on June 19, 2007, Michael was with her at her house when Sabo and his girlfriend, Linda Byers (hereinafter "Byers"), pulled into the driveway. (June 17, 2009 Tr. at 51-56). Mudgett said that Sabo and Byers had liquor, beer, guns, and a white pharmaceutical bag with them, and that they were looking to party. (Id. 55-56). Mudgett said that she told them to leave, and while Byers stayed behind, Sabo and Michael left together and went to Steven Latham's house (hereinafter "Latham"), which was down the road from her house. (Id. at 57). Later that day, Mudgett and her other son, Nick Mudgett (hereinafter "Nick"), went to Latham's house where Sabo, Latham, and Michael were all partying. (Id. at 58). She said that there was a lot of alcohol, ashtrays, beer cans, and a plate with white power on it. (Id.). She said that when they arrived Michael was very inebriated and that Nick had to escort him back inside the house and put Michael to bed. (Id. at 59-60). Soon after putting Michael to bed in the back bedroom, Mudgett said that Nick went home, but that she stayed the night at Latham's house. (Id. at 60). When she got up the next morning, she went to check on Michael, but Sabo stopped her and told her that Michael was fine, then he gave her a ride back to her house. (Id. at 61). Later that day, Mudgett decided to go back to Latham's house and when she got to Latham's house she found Michael dead in the back bedroom. (Id. at 62).

{¶5} Mudgett further testified that Sabo was the caretaker for their father and was living at their father's house while their father was staying at a nursing home. (Id. at 53-54). Mudgett said that their father had a lot of medical problems and took a lot of medications, and that Sabo was in charge of making sure their father received his medications, one of which she knew was liquid methadone. (Id. at 52-55).

{¶6} On cross-examination, Mudgett testified that Michael and Sabo had a good relationship. (Id. at 64). In addition, Mudgett acknowledged that Michael had been diagnosed as bi-polar and was taking medications for his mental illness, and that Sabo was aware of Michael's mental condition and that Michael was taking medications for it. (Id. at 64-65). Furthermore, she admitted that Michael drank and that his drinking had caused him problems. (Id. at 65).

{¶7} Nick Mudgett, Michael's younger brother, testified next. Nick, who lived with his mother, also stated that Sabo and Byers pulled into their driveway and that they were looking to party. (Id. at 72-77). Nick said that he went out with Sabo to his truck and that Sabo pulled out and showed him a prescription bag. (Id. at 78). Nick stated that Michael and Sabo left together and went to Latham's house, and later when Nick and his mother went to Latham's house, they saw everyone snorting up drugs. (Id. at 79-82). Nick said that Michael was stumbling around and that his speech was slurred and his eyes were glazed over and his pupils were the size of pins. (Id.). He put Michael to bed in the back bedroom,

and although his mother stayed behind, Nick left because he had to work the next morning. (Id. at 84).

{¶8} Linda Byers, Sabo's girlfriend, testified that on June 19, 2007, she and Sabo started at his father's house then drove over to Mudgett's house because they wanted to party. (Id. at 89-90). While she stated at trial that they had only brought vodka and beer with them that day, she later admitted that in a prior statement she had made to the police, she had said that Sabo also had taken liquid methadone and 3-5 syringes with him over to Mudgett's house. (Id. at 95-96).

{¶9} Steven Latham, who was convicted of permitting drug abuse in connection to Michael's death, testified that on June 19, 2007, Sabo and Michael came over to his house. (Id. at 107). Latham said that in addition to the alcohol Sabo brought in to his house, Sabo also had liquid methadone and some pills. (Id. at 108-09). Immediately following their arrival, Latham said that all three of them started partying with the drugs Sabo had brought. (Id. at 110). Latham said that Sabo would put the liquid methadone in a syringe and then would place the syringe under each of their tongues. (Id. at 111). Latham said that Sabo was the only one who administered the liquid methadone and that he gave Michael four hits of the liquid methadone. (Id. at 111-12). Moreover, they crushed up the pills Sabo brought, which Latham believed consisted of more than one kind of pill, and they snorted the powder. (Id. at 112-13). In addition to the drugs, Latham said that the three of them were also drinking alcohol. (Id. at 113).

{¶10} Latham said that later that day Nick and Mudgett came over and that before he left, Nick put Michael, who was "very inebriated," to bed in the back bedroom. (Id. at 114). The next day, prior to Mudgett's discovery, Latham said that he checked on Michael and discovered that Michael was dead. (Id. at 116). On cross-examination, Latham said that Michael was not forced into taking any of the drugs, and that Sabo had told them that what he was putting in the syringes was liquid methadone, although Sabo was the only person who handled the liquid methadone and administered the liquid methadone to each of them individually. (Id. at 125).

{¶11} Corporal Matt Warden and Deputy Tom Bidlack of the Union County Sheriff's Office testified that they had responded to a dispatch at 13871 Hillsview Road concerning a possible dead-on-arrival. (Id. at 25-27, 46). When Corporal Warden entered the back bedroom of the residence he found Mudgett and another man (Latham) next to Michael's body which was lying on a bed. (Id. at 28-29). Corporal Warden stated that Michael had no pulse and there was "obvious" pooling of the blood. (Id. at 29). Mudgett, who was very upset at the time, told the officers that they had been partying all night and doing drugs, and later told Deputy Bidlack that Sabo had been responsible for Michael's death. (Id. at 39, 46).

{¶12} Detective Andrew Wuertz with the Upper Arlington Police Department and Detective Jeff Stiers with the Union County Sheriff's Office

testified that they went to Sabo's residence to interview him about the circumstances surrounding Michael's death. (Id. at 127-28, 134-36). Initially, Sabo admitted that he and Byers had gone to Union County the previous night and had been drinking with Michael, but Sabo failed to mention anything about using drugs. (Id. at 129, 136). After this initial interview, Detective Stiers talked with Byers, who mentioned that Sabo had brought liquid methadone with him the previous night, so Detective Stiers confronted Sabo about the liquid methadone. (Id. at 137-38, 142-49). This time Sabo admitted to bringing the liquid methadone and giving Michael three to four hits of the drug the previous night. (Id. at 142-49). The detectives eventually recovered the methadone during a consent search of the home. (Id. at 130). Finally, Detective Stiers said that after he had confronted Sabo about the liquid methadone, Sabo made a written statement in which he admitted to giving Michael three to four hits of the liquid methadone, and even stated that he had told Michael not to go overboard with the liquid methadone because he was not used to it. (Id. at 144); (State's Ex. 23).

{¶13} Dr. Jeff Lee, the chief forensic pathologist and the deputy coroner for Licking County, testified that he performed the autopsy of Michael's body on June 20, 2007, at the request of Union County Coroner Dr. David Applegate. (June 18, 2009 Tr. at 160). Dr. Lee said that he found airway froth and brain swelling, consistent with and due to asphyxia or respiratory depression. (Id. at 161-64). Dr. Lee stated that one of the common causes of these types of injuries is

a drug overdose. (Id. at 163). Dr. Lee asked Dr. Marinetti from the Montgomery County Coroner's office to perform a toxicology report on some samples from Michael's body, and his report indicated the presence of nine different drugs, five significant ones, which included: methadone, tramadol, olazapine, oxycodone, and alcohol. (Id. at 168). Based on this report and his examination of Michael's body, Dr. Lee concluded that the cause of death was due to the acute multiple drug effects which led to respiratory depression. (Id. at 169-70). Moreover, Dr. Lee stated that, to a reasonable degree of medical certainty, out of the drugs that had caused the respiratory depression, the "most significant one without question" was the level of methadone. (Id. at 173). Dr. Lee believed that the methadone level was the most significant given the high level found in Michael's body. (Id.). Dr. Lee explained that individuals who are prescribed methadone build up a tolerance to it, but individuals, like Michael, who are naïve to the drug, or who do not use the drug on a regular basis, do not have this tolerance. (Id. at 173-74). Dr. Lee stated that he has seen naïve individuals die from methadone levels as low as 0.15 micrograms per milliliter of blood, and here, Michael exhibited a level of methadone at 1.2 microgram per milliliter of blood – eight times higher than the lowest recognized lethal level of methadone (0.15). (Id. at 173).

{¶14} Dr. Lee also explained tramadol, methadone, oxycodone, and alcohol are all respiratory depressants, which means that each of them decrease the brain's natural ability to cause the lungs to breathe; in other words, they cause the

brain to tell the lungs to slow down the breathing. (Id. at 170). These drugs eventually cause the brain to decrease the breathing of the lungs to a point where the body is not producing enough oxygen to keep the brain and heart alive, and the individual dies from a lack of oxygen. (Id. at 171). On cross-examination, as to how long different drugs would remain detectable in a person's body, Dr. Lee said that it could be as little as a few hours for one drug or as long as a few weeks for another drug. (Id. at 179).

{¶15} Dr. Marinetti, the chief forensic toxicologist at the Montgomery County Coroner's office, testified that she ran the standard toxicology tests on the samples provided to her by Dr. Lee and found the presence of alcohol, marijuana, methadone, oxycodone, tramadol, and olanzapine. (Id. at 188). On cross-examination, Dr. Marinetti stated that the amount of time a particular drug would stay in someone's body would depend on the drug, the biggest determining factor being the dose, or how much drug was taken by the individual. (Id. at 190).

{¶16} Keith Taggart, a chemist at the Bureau of Criminal Identification in Richfield, Ohio, testified that he ran the standard tests on the bottle found at Sabo's house given to him by Detective Stiers, and ultimately determined that the bottle contained liquid methadone. (Id. at 191-94).

{¶17} Finally, Dr. Applegate, the Union County Coroner, testified that he had responded to the scene of Michael's death and noticed that there was a slight froth around his mouth, indicative of a drug overdose. (Id. at 197-99). He stated

that he sent the body over to Licking County, and after reading the reports from the forensic pathologist and the forensic toxicologist, he concluded that Michael had died from polysubstance overdose. (Id. at 200). While Dr. Applegate could not say for sure which specific drug found in Michael's body actually killed Michael, Dr. Applegate stated that the methadone had been one of the more contributing drugs, and that Michael would not have died but for the ingestion of the drugs. (Id. at 200-03).

{¶18} Afterwards, the State rested and Sabo declined to put on any additional evidence in defense, so the matter was submitted to the jury, who returned guilty verdicts on all three counts of the indictment. A sentencing hearing was conducted on August 31, 2009, where the trial court imposed the following sentence: as to count one, aggravated trafficking, seventeen (17) months; as to count two, involuntary manslaughter, nine (9) years; and as to count three, aggravated possession of drugs, eleven (11) months. Each term of imprisonment was to be served consecutively for a total of eleven (11) years and four (4) months. The trial court further ordered the forfeiture of Sabo's pick-up truck, restitution to June Mudgett in the amount of $11,468.31, and the payment of costs of $1,797.50.

{¶19} Sabo now appeals and raises two assignments of error.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT AS TO COUNT TWO WHEN THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THAT CONVICTION AND IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL GUARANTEED BY AMENDMENTS V AND XIV OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION. (T – VOL. II – 252-57); JUDGMENT ENTRY.**

{¶20} In his first assignment of error, Sabo argues that his involuntary manslaughter conviction was not based on sufficient evidence and was against the manifest weight of the evidence. Specifically, Sabo claims that this conviction was erroneous because, while the jury could have found, and did find, that he was guilty of aggravated trafficking in drugs, the jury could not have found that the aggravated trafficking offense proximately caused Michael's death.

{¶21} The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, superseded by State constitutional amendment on other grounds as stated in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

**{¶22}** Alternatively, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. Id. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable admissible inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶30, citing *State v. Martin* (1983), 20 Ohio App.3d 127, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387. Further, we must be mindful that the credibility to be afforded the testimony of the witnesses is to be determined by the trier of fact. *State v. Dye* (1998), 82 Ohio St.3d 323, 329, 695 N.E.2d 763; *State v. Frazier* (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000.

**{¶23}** After a review of the record, we note that Sabo failed to make a Crim.R. 29 motion at the close of the State's case. Thus, he has waived all but

plain error as to the sufficiency of the evidence. See *State v. Jones* (2001), 91 Ohio St.3d 335, 346, 744 N.E.2d 1163. In order to find plain error, there must be a deviation from a legal rule, the error must be an "obvious" defect in the proceedings, and the error must affect a defendant's "substantial rights." *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Reversal on plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage" of justice. Id.

**{¶24}** In this case, Sabo does not dispute his convictions of aggravated trafficking in drugs or aggravated possession of drugs. Rather, his complaint on this appeal only concerns the involuntary manslaughter conviction, which is defined under R.C. 2903.04, and provides:

> **No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.**

The State had the burden to prove that Sabo caused Michael's death, and that the death proximately resulted from Sabo's commission of any felony, which in this particular case was trafficking in drugs. *State v. Shoemaker*, 3d Dist. No. 14-06-12, 2006-Ohio-5159, ¶66, citing *State v. Morris*, 105 Ohio App.3d 552, 556, 664 N.E.2d 950.

**{¶25}** This Court has previously cited to the 10th District's decision in *State v. Losey* (1985), 23 Ohio App.3d 93, 94-95, 491 N.E.2d 379, for guidance on the intention of the Legislature in its use of "proximate result" under R.C.

2903.04.   See *Shoemaker*, 2006-Ohio-5159, at ¶65.   In that decision, the 10th

District stated as follows:

> **Under [R.C. 2903.04], defendant cannot be held responsible for consequences no reasonable person could expect to follow from his conduct; he will be held responsible for consequences which are direct, normal, and reasonably inevitable-as opposed to extraordinary or surprising-when viewed in the light of ordinary experience. In this sense, then, "proximate result" bears a resemblance to the concept of "proximate cause" in that defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. State v. Chambers (1977), 53 Ohio App.2d 266, 373 N.E.2d 393 [7 O.O.3d 326. Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances. See State v. Nosis (1969), 22 Ohio App.2d 16, 457 N.E.2d 414 [51 O.O.2d 15].**

*Losey*, 23 Ohio App.3d at 95.

{¶26} Here, Sabo argues that there was insufficient evidence that his aggravated trafficking of drugs proximately caused Michael's death.  Specifically, he claims that given the evidence presented at trial, only the liquid methadone could be associated with him, and neither expert witness could say which one of the five significant drugs found in Michael caused Michael's death.  Therefore, he claims that it was unforeseeable for him to have known that Michael had toxic levels of other significant drugs in his body when he administered the liquid methadone.  We disagree.

{¶27} Based on the evidence presented in this case, we believe that reasonable minds could have concluded at the close of the State's case that

Michael's death was proximately caused by Sabo giving him the liquid methadone. While Michael's death was the result of the effects of taking multiple drugs, and neither expert could pinpoint which exact drug caused Michael's death, we believe that a fatal consequence was within the foreseeable scope of risk created by Sabo's conduct in administering the liquid methadone when there was ample evidence regarding Michael's inebriated condition, the fact that he and Sabo had taken other substances together that night, and the fact that Sabo had even warned Michael about using the liquid methadone. See *State v. Baksi* (Dec. 23, 1999), 11th Dist. No. 98-T-0123, at *16 (finding that there was sufficient evidence to support involuntary manslaughter conviction when evidence showed defendant prepared an extremely strong hit of heroin and gave the loaded syringe to another inmate who was known to abuse drugs); *State v. Grunden* (1989), 65 Ohio App.3d 777, 783-84, 585 N.E.2d 487 (finding that reasonable minds could have concluded at the close of the state's case that the infant's death was proximately caused by the defendant's conduct in leaving a gram of cocaine unattended on a coffee table, well within the reach and propensities of a thirteen-month-old child).

{¶28} First of all, there was testimony that the level of methadone found in Michael's body was at a lethal level by itself. The forensic pathologist who had conducted the actual autopsy of Michael stated that the most significant drug found in Michael's body that had contributed to his death was the methadone. This was because the level of methadone found in Michael's body was *eight times*

*higher* than the lowest lethal level of methadone typically found in naïve methadone users' deaths. Furthermore, not only was there testimony that Sabo had brought the liquid methadone, but also that he was the only one that had been in control and administered the liquid methadone to everyone, including Michael, who received three to four shots. Finally, Sabo even told the police that he had warned Michael to not go overboard with the liquid methadone because he was not used to it.

{¶29} Sabo argues that he was unaware that Michael had taken other "toxic" drugs that night; however, there was evidence that Sabo should have been aware of Michael's condition and that Michael had ingested other substances that night. Latham testified that the pills were crushed up and snorted by both Michael and Sabo, and although not directly linked to the other drugs found in Michael's body, these pills were also brought by Sabo. Furthermore, there was ample testimony about how Michael was "very inebriated" that night and had been drinking in addition to taking the methadone and snorting the white powder substance. Thus, while there may not have been evidence directly linking Sabo to the other significant drugs found in Michael's system (oxycodone, tramadol, and olanzapine), it is clear that Michael was very inebriated that night, and that Michael was ingesting other substances with Sabo in addition to drinking alcohol when Sabo provided and administered three to four hits of the liquid methadone to Michael.

{¶30} Under the facts of this case, we believe that a fatal consequence was within the foreseeable scope of risk created by Sabo's conduct in administering the liquid methadone given the evidence presented by the State, specifically Michael's inebriated condition, the fact that he and Sabo had taken other substances together, and the fact that Sabo had warned Michael about using the liquid methadone. Therefore, we find that a rational trier of fact could have found the prosecution proved beyond a reasonable doubt that Sabo proximately caused Michael's death when Sabo provided and administered the liquid methadone.

{¶31} Moreover, we do not believe that the jury clearly lost its way and created such a manifest miscarriage of justice that Sabo's conviction must be reversed and a new trial ordered. When reviewing a conviction under the manifest weight of the evidence standard of review, this Court must review the entire record. However, Sabo did not present any additional evidence in defense, thus all this Court is left with is the above evidence and testimony that was presented by the State.

{¶32} Specifically, the jury was aware of the fact that Michael had died from a combination of multiple drugs; however, there was testimony that the one drug that was clearly provided for and administered by Sabo (the liquid methadone), was the most significant drug that had contributed to Michael's death. There was evidence that the amount of methadone in Michael's body was eight times higher than the lowest lethal dosage found in overdosed naïve methadone

users. In addition, the jury heard about Sabo's own statement to Michael warning him about the liquid methadone, which at least raises a reasonable inference that Sabo was aware of the potential dangers of administering liquid methadone to naïve users. Overall, the jury was able to personally view the demeanor of the witnesses and it was in the best position to judge their credibility, and therefore, based on the above evidence, we find that the State presented ample evidence and testimony at trial so that the jury could have reasonably concluded that Sabo proximately caused Michael's death when he provided and administered the liquid methadone. Again, given Michael's inebriated condition, the fact that he and Sabo had taken other substances together, and the fact that Sabo had warned Michael about using the liquid methadone, we believe that a fatal consequence was within the foreseeable scope of risk created by Sabo's conduct in providing and administering the liquid methadone.

{¶33} Overall, when viewing the evidence in a light most favorable to the State, Michael's death, resulting from polysubstance overdose, could have reasonably been anticipated by an ordinarily prudent person as likely to result from Sabo's trafficking in drugs, and that any rational trier of fact could have found the essential elements of R.C. 2903.04(A) proven beyond a reasonable doubt. Furthermore, we cannot say that the jury lost its way in considering and weighing the evidence presented. Thus, we find that there was sufficient evidence

to support the involuntary manslaughter conviction and that the conviction was not against the manifest weight of the evidence.

{¶34} Sabo's first assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES WITHOUT MAKING THE FINDINGS REQUIRED BY R.C. 2929.14(E)(4). (T – VOL. II – 280-81); JUDGMENT ENTRY.**

{¶35} In his second assignment of error, Sabo argues that the trial court erred in failing to make the requisite findings under R.C. 2929.14(E)(4) when it stated that his three terms of imprisonment were to run consecutively. Specifically, Sabo claims that the United States Supreme Court decision in *Oregon v. Ice* (2009), __ U.S. __, 129 S.Ct. 711, 172 L.Ed.2d 517, overruled the Ohio Supreme Court's decision in *State v. Foster* (2006), 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. As a result, Sabo claims that the old sentencing scheme, which required judges to make specific findings before imposing consecutive sentences and which was overruled by the Ohio Supreme Court in *Foster*, has now been re-established by *Oregon v. Ice*.

{¶36} In *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, the Ohio Supreme Court declared that those portions of the felony sentencing statutes that required judicial fact-finding before the trial court could impose a prison sentence were violations of the Sixth Amendment pursuant to *Blakely v.*

*Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, and *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. 2006-Ohio-856, at ¶100. Subsequently, the Supreme Court excised those provisions that related to judicial fact-finding from the sentencing statutes, specifically including R.C. 2929.14(E)(4) and R.C. 2929.41(A). Id. at ¶97. As a result of the excision of those unconstitutional provisions, the Court ultimately held that, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus.

{¶37} Recently, in *Oregon v. Ice*, the United States Supreme Court examined an Oregon statute that required judges to find certain facts before imposing consecutive rather than concurrent sentences. 129 S.Ct. at 714-20. The Supreme Court upheld the constitutionality of the Oregon statute and found that it did not violate the Sixth Amendment concerns set out under *Apprendi* and *Blakely*. Id. at 719. Ultimately, the Supreme Court stated that, in light of historical practices and the right of states to administer their criminal justice systems, the Sixth Amendment did not prevent states from allowing judges, rather than juries, to make any finding of facts necessary to the imposition of consecutive, rather than concurrent, sentences. Id. at 716-20.

**{¶38}** Sabo claims that the United States Supreme Court's decision controls over the Ohio Supreme Court's decision as to matters of federal constitution law. See *Minnesota v. National Tea Co.* (1940), 309 U.S. 551, 557, 60 S.Ct. 676, 83 L.Ed. 920; *State v. Storch* (1993), 66 Ohio St.3d 280, 291, 612 N.E.2d 305. However, this Court recently addressed the potential effects of *Oregon v. Ice* in *State v. Blackburn*, 3d Dist. No. 5-09-18, 2009-Ohio-5902, ¶¶6-11, accepted for appeal by *State v. Blackburn*, 124 Ohio St.3d 1505, 2010-Ohio-799, __ N.E.2d __, and ultimately rejected the argument that *Foster* had been overruled.

**{¶39}** In *Blackburn*, we followed the reasoning of several other districts that have acknowledged the *Oregon v. Ice* decision, but have found that until the Ohio Supreme Court fully reviews and ultimately reverses its *Foster* decision, *Foster* remains binding upon this Court. *State v. Robinson*, 8th Dist. No. 92050, 2009-Ohio-3379; *State v. Franklin*, 10th Dist. No. 08AP-900, 2009-Ohio-2664; *State v. Krug*, 11th Dist. No. 2008-L-085, 2009-Ohio-3815; *State v. Miller*, 6th Dist. No. L-08-1314, 2009-Ohio-3908. We stated that while a re-examination of Ohio's sentencing statutes might be appropriate considering the *Oregon v. Ice* decision, such a review may only be performed by the Ohio Supreme Court. Id. at ¶9, citing *State v. Crosky*, 10th Dist. No. 90AP-57, 2009-Ohio-4216, ¶7; *State v. Miller*, 6th Dist. No. L-08-1314, 2009-Ohio-3908, ¶18. Therefore, we are bound to follow the law and decisions of the Supreme Court, unless or until they are

reversed or overruled. Id., citing *State v. Mickens*, 10th Dist. No. 08AP-743, 2009-Ohio-2554.

{¶40} Moreover, as Sabo acknowledges in his brief, we noted that recently in *State v. Elmore*, 122 Ohio St.3d 472, 2009-Ohio-3478, 912 N.E.2d 582, the Ohio Supreme Court briefly discussed *Oregon v. Ice*. Id. at ¶10. However, while the Court did not fully address the full ramifications of *Oregon v. Ice*, because neither party had briefed the issue before oral argument, in its decision affirming the trial court's authority to impose consecutive sentences on the defendant, the Ohio Supreme Court stated that "*Foster* did not prevent the trial court from imposing consecutive sentences; it merely took away a judge's duty to make findings before doing so." *Blackburn*, 2009-Ohio-5902, at ¶¶10-11, quoting *Elmore*, 2009-Ohio-3478, at ¶36. Thus, although the Court has not yet fully analyzed the implications of *Oregon v. Ice* as it relates to *Foster*, it appears that it has still continued to follow the principles set forth in *Foster.* See *Crosky*, 2009-Ohio-4216, at ¶8.

{¶41} Finally, Sabo points out that R.C. 2929.14 has been amended by the General Assembly eleven times since the *Foster* decision, but yet in each of its amendments, the statute has maintained the original language pertaining to judicial fact-finding and consecutive sentences. Sabo claims that given the existence of the original language in R.C. 2929.14, the United States Supreme Court's decision in *Oregon v. Ice* nullified the *Foster* decision pertaining to that language and

brought it back into full effect. We disagree. Regardless of whether the original language has remained part of the statute since *Foster*, it is clear that under the separation of powers doctrine the Ohio Supreme Court's role is not only to apply the enactments of the General Assembly but also to determine the statute's constitutionality. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 462, 715 N.E.2d 1062 ("The power and duty of the judiciary to determine the constitutionality and, therefore, the validity of the acts of the other branches of government have been firmly established as an essential feature of the Ohio system of separation of powers."); see, also, *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506 ("[i]nterpretation of the state and federal Constitutions is a role exclusive to the judicial branch"). Moreover, it is also clear that when the Court declares a statute unconstitutional, severing the unconstitutional portions of the statute is a remedy within the Court's power. See R.C. 1.50; *Simmons-Harris v. Goff* (1999), 86 Ohio St.3d 1, 17, 711 N.E.2d 203. Here, severing the unconstitutional portions of R.C. 2929.14(E)(4), which pertained to judicial fact-finding, is exactly what the Ohio Supreme Court choose to do; therefore, regardless of the existence of the language over the past few years, it is clear that the Court's declaration of the unconstitutionality and consequential severance of mandatory judicial fact-finding was a valid excision of the language and still remains binding upon this Court. It is not the place of this Court to declare unconstitutional a decision of our Supreme Court, and we must

defer to the authority of the Ohio Supreme Court regarding the constitutionality of *Foster*. See *State v. Combs*, 2nd Dist. No. 22743, 2009-Ohio-4109, ¶12, citing *State v. Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280, ¶130 ("a claim that a decision of the Supreme Court of Ohio is unconstitutional is not cognizable in this court.")

**{¶42}** Therefore, as we stated in *Blackburn*, until the Ohio Supreme Court fully addresses *Oregon v. Ice* and overrules its decision in *Foster*, *Foster* remains binding law in the state of Ohio. *State v. Blackburn*, 3d Dist. No. 5-09-18, 2009-Ohio-5902, ¶¶6-11.

**{¶43}** Sabo's second assignment of error is, therefore, overruled.

**{¶44}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**ROGERS and SHAW, J.J., concur.**

**/jnc**