[Cite as *In re Forbess*, 2010-Ohio-2826.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY


IN RE:

                                          CASE NO. 2-09-20

    NICHOLAS FORBESS,


ADJUDICATED DELINQUENT CHILD,

                                        **O P I N I O N**

    DEFENDANT-APPELLANT.


**Appeal from Auglaize County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 2008 DEL 420**

**Judgment Affirmed**

**Date of Decision:   June 21, 2010**


APPEARANCES:

    *Amanda J. Powell*  for Appellant

    *Edwin A. Pierce and Amy Otley Beckett*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Nicholas Forbess, appeals from the judgment of the Court of Common Pleas of Auglaize County, Juvenile Division, adjudicating him a delinquent child on one count of gross sexual imposition, placing him on community control for an indefinite period of time, and classifying him as a Tier I sex offender. On appeal, Forbess argues that the juvenile court erred in admitting his custodial statements to police into evidence; that the juvenile court's delinquency finding was unsupported by sufficient evidence and against the manifest weight of the evidence; that the juvenile court violated his constitutional right to equal protection when it applied R.C. 2152.83 to adjudicate him a Tier I sex offender; and, that he was denied the effective assistance of counsel. Based on the following, we affirm the judgment of the juvenile court.

{¶2} In November 2008, a complaint was filed alleging Forbess was a delinquent child on one count rape in violation of R.C. 2907.02(A)(2), a felony of the first degree if committed by an adult.[1] The complaint arose from an allegation that Forbess forced his sister's nineteen-year-old baby sitter, C.B., into his bedroom and onto his bed, and forcibly engaged in sexual intercourse with her. Forbess entered a denial to the complaint.

---

[1] We also note that two other complaints were filed against Forbess, one alleging him to be a juvenile traffic offender by virtue of a turn signal violation, and one alleging him to be an unruly child by virtue of a curfew ordinance violation. However, these complaints were dismissed at trial and are not the subject of this appeal.

{¶3} In March 2009, the case proceeded to trial, at which C.B. testified that, on July 1, 2008, Guadalupe Behrens called her and asked if she would babysit her granddaughter, Lilly; that she knows Guadalupe and her family because they attend church together; that, when she arrived at the Behrens' residence, Matt, Guadalupe's son, and Forbess, Guadalupe's grandson, were also present; that Forbess and Matt left the residence around 9:00 or 10:00 a.m. and Forbess returned around 1:00 p.m.; that she made lunch for Lilly and then went upstairs to put her in bed; that Forbess was upstairs at the time, and asked her to help him clean his room; that she refused, but he continued insisting and eventually pulled her into his room; that Forbess would not allow her to leave the room; that Forbess pushed her onto the bed and held her down; that he then pushed her clothes off despite her requests to stop; that he touched her body with his hands and mouth; that she tried to get off the bed but was unable to; that he placed his penis in her vagina; that he then pulled his penis out and ejaculated "all over the room," with some landing on her sock (trial tr., vol. 1, p. 18); that they then both dressed, went downstairs, and Forbess left; that Sheila Goins then arrived shortly thereafter to drop off Sophia, Guadalupe's granddaughter, and, subsequently, Kim Behrens, Guadalupe's husband, also arrived at the residence; that she did not tell either Kim or Sheila about the incident; that Guadalupe then arrived home and offered to drive her home; that, when she arrived home, she

wanted to tell her mother what occurred, but was not sure how to tell her, so she mowed the grass first; that she then told her mother about the incident, and they called the police; and, that she never consented to having sexual intercourse with Forbess.

{¶4} On cross-examination, C.B. testified that she did not recall Guadalupe telling her to not go upstairs; that she was menstruating at the time of the incident and was wearing a sanitary pad; that the pad would have prevented penetration; that she did not remember seeing blood on the bed or on herself after the incident, and that she did not look to see if there was blood on Forbess; that, when she went to the hospital following the incident, she was wearing the same pad; that she did not know a woman named Lydia Kohlhorst or remember Kolhorst telling her to "discontinue telephone calls" (Id. at p. 34); that she had reported a previous rape two years after it had allegedly occurred, but the man was not convicted; that she had made a prior complaint to the police about her mother hitting her, but the police found the report to be false; that she had made a false ambulance report when she had a severe case of depression; that she took medication for the depression, but ceased taking it in 2007; that she told Patrolman Ernst how Forbess pulled her into his room, but she did not demonstrate to Patrolman Ernst how this occurred, and if he reported that she did conduct a demonstration, he would be lying; that she never told Patrolman Patrick Green that

Forbess ejaculated inside of her or that she was worried about getting pregnant; that she could not remember if Forbess ejaculated inside of her; that some of Forbess' semen landed on her sock after he stood up from the bed; and, that she did tell Patrolman Green that she was concerned Forbess would "try and turn this around on her and get her in trouble because he is a minor and she is nineteen years of age." (Id. at p. 43).

{¶5} C.B. further stated on cross-examination that she continued babysitting for a couple hours after the incident with Forbess occurred; that she did not have any bruises on her body; that, when Guadalupe called her at 3:30 p.m. on the day of the incident, she did not recall telling her that she did not have to hurry home; that she did not tell the Behrens when they arrived home that she wanted to stay with them and go shopping, and if they stated that, they would be lying; that she could not remember if she offered to go with Guadalupe on the day of the incident to pick up her son Matt and his friend so that they could pick up a chair they had purchased; that she had never taken jewelry or pills from the Behrens' residence; and, that she had filed false police reports in the past when she had been dealing with a severe case of depression.

{¶6} Patrolman Green of the Wapakoneta Police Department testified that he received a complaint of a sexual assault on July 1, 2008; that he responded to C.B.'s residence to discuss the assault; that when he arrived, C.B. was present and

visibly upset; that he collected C.B.'s clothing, including a sock that she claimed contained a semen stain; that he sent the sock and clothing to the Bureau of Criminal Identification and Investigation ("BCI") for DNA testing; that the testing on the sock revealed two DNA samples, one from Forbess and one from C.B.; that, when executing the search warrant on Forbess' bedroom, he did not see a television in the room; that he interviewed Forbess regarding the incident with C.B., and Forbess stated he did not have sexual intercourse or engage in other sexual activity with her; and, that based on his interview with Forbess and C.B., and the lab results from C.B.'s clothing, he determined there was sexual intercourse between the two.

{¶7} On cross-examination, Patrolman Green testified that Forbess was in the police station in the presence of his father[2] at the time he denied having sexual contact with C.B.; that he did not find any bruises on C.B.'s body at the time of the interview; that C.B. indicated during the interview that Forbess ejaculated inside of her, and that she was worried about becoming pregnant; that he interviewed C.B. on two separate occasions, but her statements were different in each interview due to the fact that she was under stress during the first interview and was able to remember more at the second interview; that he confiscated bed linens and blankets from Forbess' bed as a result of a search warrant executed on

---

[2] Although Patrolman Green testified that Forbess' father was with him at the police station, we assume he meant grandfather, as Kim is Forbess' custodial grandfather and was present with him at the police station.

the residence, but he did not send them to BCI for testing; that he collected C.B.'s clothing but found no blood on it; and, that there was no physical evidence that Forbess penetrated C.B. on the bed.

{¶8} Cory Hines testified that Forbess was at his house around 1:30 p.m. on the day of the incident; that the two played videogames that day; and, that, later in the day, Forbess sent him a message requesting that he tell police officers Forbess was at his house at noon that day, but that Forbess never asked him to "cover for him." (Id. at p. 143).

{¶9} Jennifer Akbar testified that she was employed as a forensic scientist by BCI; that the Wapakoneta Police Department submitted several pieces of evidence to her for DNA analysis, including two rape kits, a pair of underwear, a sanitary pad, and a pair of socks; that she found a semen stain on the socks and another individual's DNA; that, after testing the material found on the sock, she found that the semen stain contained Forbess' DNA, and C.B.'s DNA was also found on the sock; that her examination of C.B.'s vaginal, anal, and oral samples did not reveal the presence of semen; that a swab analysis of C.B.'s breasts did not reveal any bodily fluids; that C.B.'s underwear did not contain semen and was not tested for blood; that an analysis of C.B.'s sanitary pad did not reveal the presence of semen; and, that her analysis of Forbess' penile swabs only revealed his DNA.

{¶10} Officer Jeffrey Eisert of the Wapakoneta Police Department testified that he assisted Patrolman Green in his investigation of the incident; that, in his initial interview with C.B., she was very emotional and cried at times; that he also took Forbess to the hospital to have a sexual assault exam performed; that Forbess talked to him and asked him questions while on the way to the hospital, but that he told Forbess we was not going to speak with him or ask him any questions, as Forbess had previously stated he did not wish to speak with him; that, while at the hospital, he made a statement denying any "sexual contact" with the victim (id. at p. 191); and, that Forbess also made this statement to the nurse performing the sexual assault exam, while the nurse was asking him questions during the exam.

{¶11} Subsequently, the State rested its case and several exhibits were admitted into evidence without objection, including a videotape of Patrolman Green's interview with Forbess and the DNA testing results from BCI.

{¶12} Joseph Seitz then testified that he was friends with Matt Behrens; that, on the day of the incident, Guadalupe picked up him and Matt around 3:00 or 4:00 p.m. so that they could go to the thrift store to pick up two chairs; that C.B. was with Guadalupe; and, that C.B. was acting normal at the time and had "regular conversation" with Guadalupe. (Id. at p. 200).

{¶13} Guadalupe testified that she had raised Forbess since he was three months old, but that he was actually her biological grandson; that she had known

C.B. for four years, as they attended the same church; that she hired C.B. to babysit for her younger daughter, Lilly, on July 1, 2008; that she instructed C.B. to not go upstairs, and that, if Lilly wanted to take a nap, she should put her in the playpen downstairs; that the playpen has been in the same place in her home for three years; that she did not want C.B. to go upstairs because Matt and Forbess were still asleep and would be in their underwear, and because she had medication in her bedroom; that C.B. had been at her home on previous occasions and had previously gone upstairs without her permission; that, during the day while C.B. was babysitting, she called C.B. approximately six times; that one of her calls was between 12:00 and 12:30 p.m., and C.B. stated that everything was going okay and Forbess had left to get cat food but had not yet returned; that she called again around 3:30 p.m., and C.B. again indicated everything was going well and that Forbess had still yet to return with the cat food; that she asked C.B. if she cared if she stopped on her way home to get cat food, and C.B. stated that was fine and she was not in a hurry; that she had spoken with Forbess during the day, and he was at a friend's house; that C.B. also told her that Lilly had blood in her stool, but that was found not to be true; that, when she returned home, she asked C.B. if she could make some phone calls before she took her home, and C.B. replied that it was "no problem" (trial tr., vol. 2, p. 235); that, subsequently, Matt called her and asked if she could help him and Seitz pick up a chair they purchased; that she

asked C.B. if she wanted to "pick up this chair with the boys," and C.B. agreed (id. at p. 236); that she never told C.B. who "the boys" were, and whether Forbess was one of them; that, when they arrived at the thrift store to pick up the chair, C.B. asked if she could go into the store to shop, but she told her that she did not have time; that she then proceeded to take C.B. home, and, on the way home, C.B. was joking around with her and even asked her if she needed a babysitter again tomorrow; that C.B. never indicated to her that Forbess had attacked her; and, that C.B. said she would see her the following day at church.

{¶14} Guadalupe further testified that she had never asked C.B. to clean her home, as she hired someone else to clean; that, the year prior to the incident, C.B. asked Forbess if he would take her to a dance, but he refused; that she filed a police report alleging that, on the day C.B. babysat, she stole some of her prescription drugs and jewelry; that she did not make this police report until almost six months after C.B. reported the alleged rape; that she waited to make the report because she did not realize C.B. could have committed the theft until she saw the discovery from the case, wherein C.B. made a statement that she remembered her address from a prescription bottle that was sitting in the kitchen, but she never kept her medicine in the kitchen but always in her bedroom; and, that the police never investigated her report.

{¶15} Ruth Baeumel testified on direct examination that she was a registered sexual assault nurse examiner at Joint Township Hospital; that she examined both Forbess and C.B. on July 1, 2008; that, during her exam of C.B., she indicated to her that she could not recall if Forbess inserted his penis into her vagina, but that he had inserted his finger; that C.B. later indicated to her that Forbess had inserted his penis into her vagina; that C.B. also told her Forbess had kissed and licked her breasts; that she did not find any cuts, abrasions, or bruises on C.B.'s body; that C.B. indicated during the exam that she had not showered since the time of the sexual assault; that she used a Woods lamp to detect if there was semen on C.B.'s body, but none was detected; that she did not find any evidence of injury on C.B.'s body, including her vagina; and, that she also examined Forbess and did not find any vaginal fluid on or in his penis.

{¶16} Kim Behrens testified that he knew C.B. from church; that C.B. babysat for his family on one other occasion, but that it was unbeknownst to them, as the baby sitter they hired had asked C.B. to fill in for her while she was babysitting; that, when he arrived home on July 1, 2008, he discovered C.B. babysitting at his home; that she was not "acting like, you know, something bad ha[d] happened" (id. at p. 304); that, when his wife arrived home, he asked C.B. if she wanted him to take her home, and she stated she did not want to go home; that his wife ended up taking C.B. home; that, later in the evening, Officer Eisert came

to his house and asked if Forbess could come to the police station to answer some questions; that, while at the police station, Forbess was asked if he had sex with C.B., and he indicated that he had not; and, that Forbess was, in fact, not being truthful, probably because he was too embarrassed to admit that he was having sex.

{¶17} Forbess testified on direct examination that, on July 1, 2008, he awoke around 10:30 a.m. to see his "PO officer" at the courthouse (id. at 327); that, when he returned home, C.B. was there babysitting and watching television; that he went upstairs to his room and began watching television; that, subsequently, C.B. entered his room and sat on the end of his bed; that they began talking, and she stated that her neck was hurting; that he replied he was good at giving shoulder massages and began giving her a shoulder massage; that she did not resist him in any way and indicated she liked the massage; that, during the massage, she turned around, and they began kissing; that he did not know who kissed whom, but that it was a "fifty-fifty thing" (id. at 331); that he began to rub her chest while they were kissing; that, at some point, he took his shirt and shorts off, and C.B. began to rub his penis; that he could not remember if she had her shirt off, but she still had her pants on; that, at some point, he ejaculated, but he could not remember where his semen went; that C.B. asked him to lick and bite her nipples, but he thought that was "just kind of weird" (id. at 332); that, after he

ejaculated, he removed C.B.'s pants and underwear; that C.B. assisted him in removing these items because he had difficulty; that, once he removed her underwear, they were "about to have sex," but he stopped because "she had this really nasty smell" (id. at 333); that he "got a better look at her and then [his] first thought was like, 'what the hell am I doing'" (id.); that he then pulled away from her and began getting dressed; that C.B. looked upset and stunned; that he tried to make up an excuse for not continuing with her, so he told her they should not continue because she was supposed to be babysitting and the baby could wake up; that she then told him the baby was asleep and not to worry about it, but he repeated the same thing to her; that she then looked really upset, got dressed very quickly, and went downstairs; that, when he went downstairs, he felt bad about what happened and "was thinking about something [he] should say to her like, '[he's] sorry' or something along those lines" (id. at 334); that he went into the kitchen to apologize to her, but, before he could say anything, she interrupted him and told him that Guadalupe left five dollars to purchase cat food; and, that he took the money and left but did not return because he did not want to be around C.B. due to the awkwardness.

{¶18} Forbess further testified that, on the day of the incident, there was a playpen in the living room; that Guadalupe had not left any medication on the kitchen counter that day, as she always kept her medication upstairs; that he did

not penetrate or attempt to penetrate C.B. with his finger or penis; that, later in the evening on July 1, he went to the police station; that he told the police that he did not have sex or "do anything" with C.B. (id. at 338); that he did not want to tell the police the truth because Kim was in the room, and he knew Kim would not leave if he asked him; that he also did not want to tell the truth because he was afraid other people at school would find out and he would lose respect; that Kim was the last person he would want to find out about the incident; that he did not tell the truth about the incident until recently; and, that he and C.B. still went to the same church after the incident, and even sat near each other on a couple occasions.

{¶19} On cross examination, Forbess testified that, in his interview with Patrolman Green, he told him that he was at his friend Cory's house between 11:00 a.m. and 2:00 p.m. on the day of the incident; that, he also told the officer they could find semen on C.B.'s sock because he masturbated and ejaculated into a towel the night before, and she could have stepped in it; and, that, after he learned that forensic testing indicated semen was found on the top and bottom of the sock, he still did not tell the police that the sexual acts with C.B. were consensual.

{¶20} During Forbess' testimony, the tape recording of his interview with the police was played. The recording showed Forbess, with Kim present, being

asked by Patrolman Green what he did on July 1, 2008, to which Forbess responded that he went to the courthouse earlier in the day and over his friend's house later in the day. Patrolman Green then exited the interview and returned to read Forbess his *Miranda* rights. Patrolman Green then asked Forbess if he had engaged in sexual intercourse with C.B. Forbess indicated he had not and stated that nothing sexual took place between himself and C.B. Patrolman Green continued to ask Forbess whether he had sex with C.B., and Forbess continued to answer in the negative. Subsequently, Kim told Patrolman Green that Forbess was exercising his right to remain silent, and they left.

{¶21} Dr. Kenneth Fox testified that he was an emergency room physician at Joint Township Hospital; that he assisted in the exam of C.B.; and, that his exam did not reveal any bruises, abrasions, cuts, or any other evidence of forced penetration.

{¶22} Lydia Kohlhorst testified that she knew C.B., the Behrens, and Forbess, as they all attended church together; that C.B. had been at her home before, despite C.B.'s prior testimony that she did not know her; that she had telephone communication with C.B. regarding the prior accusation of rape that C.B. testified she waited two years to report; that C.B. had called her home multiple times regarding that incident, and she was trying to block the telephone

-15-

calls from C.B. to the alleged victim[3]; that the calls could be classified as harassing; and, that she told C.B. to stop calling her regarding that incident.

{¶23} Sheila Goins testified that she knew the Behrens, C.B., and Forbess, as she attended church with all of them; that C.B. had babysat her son on prior occasions; that, on July 1, 2008, she was babysitting Sophia, the Behrens' granddaughter; that she called the Behrens' residence that afternoon to ask if she could drop off Sophia because she had to be at an appointment; that C.B. answered the phone and indicated that she could drop off Sophia with her; that C.B. seemed happy on the phone and was "in good spirits" (id. at 374); that, during the phone call, she asked C.B. how things were going in her life and she said, "fine" (id. at 374); that she later dropped off Sophia at the Behrens' residence with C.B., and C.B. again did not indicate there were any problems; that, when she was at the residence, Lilly was sleeping upstairs; that it was not unusual for Lilly to sleep upstairs because her room was there; that, when she babysat Lilly at the Behrens' residence, Lilly slept on the couch in the living room; that she did not go upstairs while babysitting; and, that there was a playpen in the living room at the Behrens' residence when she dropped off Sophia.

{¶24} Subsequently, the juvenile court found Forbess to be a delinquent child on one count of gross sexual imposition, a lesser included offense of rape, in

---

[3] We note that, because C.B. claimed she was the victim of the rape, we assume the use of the word victim in this context refers to the victim of the "harassing" telephone calls from C.B.

Case No. 2-09-20

violation of R.C. 2907.05(A)(1), a felony of the fourth degree if committed by an adult. The juvenile court stated the following from the bench:

> **The Court has examined the testimony and evidence presented, considered the law, and as to the elements of the offense of rape, in violation of 2907.02(A)(2), the Court does find beyond a reasonable doubt that the activity complained of did occur on July 1, 2008. Secondly, that the activity did occur in Auglaize County, Ohio, and further that the activity was involved where the offender purposely compelled the victim, [C.B.], to submit by force or threat of force. The Court, however, is not satisfied that there is sufficient evidence of sexual conduct in or as defined in the Ohio Revised Code, but does find beyond a reasonable doubt evidence of sexual contact as that matter is defined within Section 2907.05; finds the sexual contact to be the touching of the breasts and other erogenous zones of the victim with purpose to sexually satisfy the offender. * * * The elements of gross sexual imposition therefore are the same and gross sexual imposition is a lesser included offense of rape. Therefore, the Court does find sufficient evidence beyond a reasonable doubt that the child committed gross sexual imposition as defined in Section 2907.05(A)(1) of the Ohio Revised Code. * * ***

> **The problem, of course, with this case is the credibility of the witnesses presented to the Court. The Court does choose to believe the victim of this offense over the child. The child's story repeatedly changed through the course of these proceedings and the only reason that the Court can determine that occurred was because that [sic] he was guilty of some offense. The Court, however, does not believe or cannot with satisfaction state that there was sexual conduct in this matter, as the victim was unsure with regard to the issue of penetration when she first appeared at the hospital, has consistently maintained of her unsureness with regard to the issue of ejaculation inside of her which is not an element but is nonetheless evidence. And the Court, therefore, has made its finding that the child is delinquent by virtue of the lesser included offense of gross sexual imposition as a felony of the fourth degree.**

Case No. 2-09-20

(Id. at p. 401-403).

{¶25} In June 2009, the juvenile court held a dispositional and sexual offender classification hearing, in which it placed Forbess on community control and intensive probation for an indefinite period of time and classified him as a Tier I sex offender. It is from this finding of delinquency and sexual offender classification that Forbess appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT VIOLATED NICHOLAS FORBESS' RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTION SIXTEEN OF THE OHIO CONSTITUTION, AND R.C. 2151.352 WHEN IT ADMITTED INTO EVIDENCE THE VIDEOTAPE OF NICHOLAS FORBESS' CUSTODIAL STATEMENTS TO THE POLICE, WHICH WERE OBTAINED IN VIOLATION OF *MIRANDA V. ARIZONA* (1966), 384 U.S. 436, AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION TEN, ARTICLE I OF THE OHIO CONSTITUTION AND R.C. 2151.352. (MARCH 12-13, T.PP. 194; 343-350); (ST. EX. 2).**

*Assignment of Error No. II*

**THE TRIAL COURT VIOLATED NICHOLAS FORBESS' RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTION SIXTEEN OF THE OHIO CONSTITUTION, AND JUV.R. 29(E)(4), WHEN IT ADJUDICATED HIM DELINQUENT OF GROSS SEXUAL IMPOSITION ABSENT PROOF OF EVERY ELEMENT OF THE CHARGE AGAINST HIM BY SUFFICIENT,**

COMPETENT, AND CREDIBLE EVIDENCE. (MARCH 12-13, 2009, T.PP. 328; 331; 332; 338-339; 354; 401-402); (JUNE 18, 2009, T.P. 42); (A-8); (A-10).

*Assignment of Error No. III*

NICHOLAS FORBESS' ADJUDICATION AND COMMITMENT MUST BE REVERSED AND REMANDED FOR A NEW TRIAL BECAUSE HIS ADJUDICATION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTION SIXTEEN OF THE OHIO CONSTITUTION. (MARCH 12-13, 2009, T.PP. 14-15; 18-19; 39-40; 42-43; 62; 63; 64-65; 84; 167; 168; 171; 203-204; 269; 279; 283; 331-332; 328; 332; 347; 354; 402); (JUNE 18, 2009, T.P. 42); (A-3); (A-6); (A-8); (A-10); (A-12); (A-15); (A-31).

*Assignment of Error No. IV*

THE JUVENILE COURT ERRED WHEN IT APPLIED R.C. 2152.83 TO NICHOLAS FORBESS, AS IT VIOLATES HIS RIGHT TO EQUAL PROTECTION UNDER THE LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION TWO OF THE OHIO CONSTITUTION. (A-10); (JUNE 18, 2009, T.PP. 43-44).

*Assignment of Error No. V*

NICHOLAS FORBESS WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

*Assignment of Error No. I*

{¶26} In his first assignment of error, Forbess argues that the juvenile court erred in admitting into evidence his videotaped statements to police. Specifically, he contends that several statements were made without obtaining a proper *Miranda* waiver; that the statements were taken in violation of his right to counsel under R.C. 2151.352; and, that his statements were coerced and involuntary. We disagree.

{¶27} "'Juveniles are entitled both to protection against compulsory self-incrimination under the Fifth Amendment and to *Miranda* warnings where applicable.'" *In re K.W.*, 3d Dist. No. 9-08-57, 2009-Ohio-3152, ¶12, quoting *State v. Thompson,* 7th Dist. Nos. 98 JE 28, 98 JE 29, 2001-Ohio-3528, citing *In re Gault* (1967), 387 U.S. 1, 54. Any statements made by a suspect may not be used in evidence where those statements were made during a custodial interrogation unless *Miranda* warnings were properly given to the suspect. *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶18, citing *Miranda v. Arizona* (1966), 384 U.S. 436, 444; *State v. Mason* (1998), 82 Ohio St.3d 144, 153. Interrogation is defined as any "statement, question or remark by a police officer * * * reasonably likely to elicit an incriminating response * * *." *State v. Knuckles* (1992), 65 Ohio St.3d 494, paragraph two of the syllabus. Furthermore, "[a] person is considered in custody for purposes of *Miranda* when he is placed under formal arrest or his freedom of action is restrained to a degree associated

with a formal arrest." *State v. Simpson,* 10th Dist. No. 01AP-757, 2002-Ohio-3717, ¶33. The proper inquiry for determining if an individual has been placed in custody is whether, under the totality of the circumstances, a reasonable person would believe he is not free to leave. *State v. Gumm* (1993), 73 Ohio St.3d 413, 429, citing *U.S. v. Mendenhall* (1980), 446 U.S. 544, 554.

{¶28} A suspect may either waive or invoke his *Miranda* rights, including his Fifth Amendment right to counsel, and, if a request for counsel is made, the interrogation must not recommence until counsel is present. *State v. Kleingers*, 1st Dist. Nos. C-980764, 98TRC-17902A, 1999 WL 567096, citing *Miranda*, 384 U.S. at 474. In determining whether a juvenile has properly waived his *Miranda* rights, the reviewing court must examine the totality of the circumstances surrounding the waiver, "'including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶57, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, paragraph two of the syllabus. Moreover, although statements obtained in violation of *Miranda* must be suppressed, the content of the statements can be used for impeachment purposes, provided the statements were not coerced or involuntary. *State v. Mason*, 3d Dist. No. 9-94-45, 1996 WL 715480, citing *Harris v. New York* (1971), 401 U.S. 222.

**{¶29}** Additionally, R.C. 2151.352 provides juveniles with the right to counsel that goes beyond constitutional requirements. *In re C.S.,* 115 Ohio St.3d 267, 2007-Ohio-4919, ¶83. See, also, Juv.R. 4(A). The statutory section provides this right "at all stages of the proceedings under this chapter or Chapter 2152 of the Revised Code." R.C. 2151.352. Chapter 2152 of the Ohio Revised Code specifically deals with juvenile offenses, with the commencement of juvenile delinquency proceedings beginning with the filing of a complaint. *Wright v. State* (1990), 69 Ohio App.3d 775, 781. See, also, Juv.R. 29(G) (defining "court proceeding" as "all action taken by a court from the earlier of (1) the time a complaint is filed and (2) the time a person first appears before an officer of a juvenile court until the court relinquishes jurisdiction over such child").

**{¶30}** In the case at bar, Forbess claims that it was error for the juvenile court to admit his videotaped statements to the police, as the statements were involuntary and were taken in violation of *Miranda* and his right to counsel under R.C. 2151.352. We initially note that Forbess' trial counsel did not object to the videotape statements being played at the trial or to their admission into evidence. Consequently, Forbess has waived all but plain error. See Crim.R. 52(B). *State v. Lewis*, 10th Dist. No. 97APA09-1263, 1998 WL 418913.

**{¶31}** In order to have plain error under Crim.R. 52(B), there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error

must have affected "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. Plain error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431, 1997-Ohio-204; see *State v. Johnson*, 3d Dist. No. 2-98-39, 1999-Ohio-825.

{¶32} During the recorded interview, Patrolman Green asked Forbess a few introductory questions, including his name and address and what he did that day, before reading him his *Miranda* rights. After reading Forbess his *Miranda* rights, Forbess and Kim both indicated they understood the rights, and Patrolman Green then asked him specific questions regarding C.B., including whether they engaged in sexual intercourse. After several more questions, Kim indicated to Patrolman Green that Forbess was not going to answer any more questions, and they immediately left the room. Accordingly, we find there to be no *Miranda* violation. Patrolman Green read and Forbess acknowledged his *Miranda* rights prior to his questioning regarding C.B., and Forbess clearly chose to waive those rights by not invoking them and answering the questions. When Forbess did exercise his right to remain silent, the interview immediately ceased, thereby complying with *Miranda*.

{¶33} Additionally, we find there to be no violation of Forbess' right to counsel pursuant to R.C. 2151.352. Although Forbess argues that interrogation is considered a "stage" of the proceeding under this statutory section, wherein his right to counsel attaches, he misreads the statute. A juvenile criminal proceeding does not commence until the filing of a complaint, and, at the time of the interview, no complaint had been filed. Although Forbess did have a Fifth Amendment right to counsel under *Miranda*, he never exercised that right at any point during the interview by requesting an attorney. Furthermore, Forbess cites to no authority for his proposition that his right to counsel under R.C. 2151.352 applies during an investigatory interrogation.

{¶34} Moreover, Forbess' argument that the recorded interview could not be used for impeachment purposes because it was coerced and involuntary is unsupported by the evidence. Although Forbess was only sixteen at the time of the interview, his grandfather was present with him during the interview. Additionally, the interview lasted only a few minutes, and Patrolman Green was polite throughout the interview and did not threaten or coerce him into answering any questions. Furthermore, Forbess provides no evidence in support of his assertion that his statements were involuntary.

{¶35} Accordingly, because we find Forbess' interview with Patrolman Green did not run afoul of *Miranda*; that he had no right to counsel pursuant to

R.C. 2151.352; and, that his statements were voluntary, we overrule his first assignment of error.

*Assignment of Error No. II*

{¶36} In his second assignment of error, Forbess argues that the juvenile court's finding of delinquency on one count of gross sexual imposition was unsupported by sufficient evidence. Specifically, he asserts that the juvenile court indicated it did not believe C.B.'s story that a rape occurred, and that his testimony regarding the events was supported by the evidence, thereby not fulfilling the elements for gross sexual imposition. We disagree.

{¶37} The United States and Ohio Constitutions provide juveniles "the same rights to due process as those afforded to adults. Of these rights is the right to the assumption of innocence until proven beyond a reasonable doubt." *In re Callahan*, 3d Dist. No. 9-01-39, 2001-Ohio-2270, citing *In re Gault* (1967), 387 U.S. 1; *In re Anderson*, 92 Ohio St.3d 63, 2001-Ohio-131. When an appellate court reviews a record for sufficient evidence of guilt, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 392, 2005-Ohio-2282, citing *State v. Jenks* (1981), 61 Ohio St.3d 259, superseded by

state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra.

{¶38} Forbess was found delinquent on one count of gross sexual imposition under R.C. 2907.05(A)(1). The statute provides as follows:

> **(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**
>
> **(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.**

{¶39} R.C. 2907.01(B) defines sexual contact as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." Additionally, the revised code defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶40} The Supreme Court of Ohio has addressed the issue of the amount of force necessary to commit the offense of rape under R.C. 2907.02. In *State v.*

*Eskridge* (1988), 38 Ohio St.3d 56, the Court stated that the amount of force "depends upon the age, size and strength of the parties and their relation to each other." Id. at paragraph one of the syllabus. The key element in a finding of force is that the victim's will was overcome by fear or duress. See *State v. Heft*, 3d Dist. No. 8-09-08, 2009-Ohio-5908, ¶88, citing *Eskridge*, 38 Ohio St.3d at 58-59.

**{¶41}** In the case at bar, C.B. testified that Forbess pulled her into his room and would not let her leave; that he forced her onto his bed and held her down; that she attempted to get up from the bed but was unable to; that Forbess removed her clothing; that he touched her body with his hands and mouth, including licking her breasts; that he placed his penis in her vagina; and, that he pulled out of her before ejaculation, with some of his semen landing on her sock.

**{¶42}** We do note that, despite C.B.'s testimony, the juvenile court found that the evidence did not support a finding that Forbess penetrated C.B.; however, other evidence corroborated her version of the events, including the semen found on her sock. While Forbess testified that the encounter was consensual, the juvenile court was in the best position to view the testimony and judge the credibility of witnesses, *State v. Sabo*, 3d Dist. No. 14-09-33, 2010-Ohio-1261, ¶22, citing *State v. Dye* (1998), 82 Ohio St.3d 323, 329, 1998-Ohio-234, and, being that Forbess was not truthful in his initial interview with police, we cannot

find that it was unreasonable for the juvenile court to believe most of C.B.'s testimony over his testimony.

{¶43} Accordingly, because C.B.'s testimony alone was sufficient evidence of all the elements of gross sexual imposition, we find that the juvenile court's delinquency finding was supported by sufficient evidence.

*Assignment of Error No. III*

{¶44} In his third assignment of error, Forbess argues that the juvenile court's delinquency finding was against the manifest weight of the evidence. Specifically, he contends that C.B.'s testimony regarding the incident was not credible because it was contradictory to the testimony of several other witnesses and her previous statements to police, and that his testimony that the sexual contact was consensual was supported by the evidence, including the lack of evidence of physical force found on C.B. We disagree.

{¶45} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by constitutional amendment on other grounds as

stated by *Smith,* 80 Ohio St.3d 89, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶46} Here, testimony was presented by the State and Forbess that reflected two different versions of the incident. On the one hand, C.B. testified that Forbess forced her into his bedroom, held her down on the bed, removed her clothes, licked and kissed her body, inserted his penis into her vagina against her will, and ejaculated on her sock. This version of the event was supported by a finding of both C.B.'s and Forbess' DNA on the sock. Furthermore, Officer Eisert and Patrolman Green both testified that C.B. was very upset and crying when they initially spoke with her about the incident.

{¶47} However, there was testimony presented indicating that C.B. changed her story of the incident, and that the evidence did not fully support her version of the incident. Patrolman Green testified that the account of the incident that C.B. gave the first time was somewhat different than the account she gave to him during their second interview, and that C.B. indicated Forbess ejaculated inside of her, despite her testimony at trial that she did not tell him that, and that she was unsure if Forbess ejaculated inside of her. Ruth Baeumel testified that, during her examination of C.B., she indicated to her that she was unsure if Forbess had inserted his penis into her vagina, but that he had inserted his finger.

However, C.B. later told her that Forbess had inserted his penis into her vagina. Additionally, both Patrolman Green, Dr. Fox, and Baeumel all testified that they did not see bruises on C.B.'s body, and Baeumel testified that her examination did not reveal any of Forbess' DNA on C.B.'s body.

{¶48} Furthermore, testimony was presented attacking C.B.'s credibility. Guadalupe testified that she told C.B. not to go upstairs while babysitting and that Lilly could sleep downstairs in the playpen, and Kim Behrens and Sheila Goins both testified that there was a playpen downstairs on the day of the incident; however, C.B. testified that she was never told she could not go upstairs, and that there was not a playpen downstairs the day she babysat for Lilly. Lydia Kohlhurst testified that she knew C.B. from church, and that she told C.B. to stop making harassing telephone calls to her regarding an allegation of a prior rape. However, C.B. testified that she did not know Kohlhurst. Additionally, C.B. testified that she had made a false ambulance report in the past; that she had also made a police report that her mother hit her, which the police determined to be untrue; and, that she had made a previous rape allegation, but the man was not convicted.

{¶49} Moreover, testimony was also presented indicating that, shortly after the incident, C.B. did not appear as if she had experienced the traumatic rape to which she testified. Guadalupe testified that she called C.B. on multiple occasions the day she babysat, and each time C.B. indicated everything was going well; that

she asked C.B. if it was okay if she made a stop on her way home from work, and C.B. indicated that she was in no hurry to go home; that, when she returned home, she told C.B. that she wanted to make some phone calls before she took her home, and C.B. indicated that would be fine; and, that C.B. also agreed to go with her to pick up some chairs from the thrift store before she took her home. Kim testified that, when he arrived home from work, C.B. was babysitting and acted as if nothing bad happened to her, and that he offered to take her home, but she indicated she did not want to go home. Additionally, Goins testified that, when she called the Behrens' residence to ask if she could drop off Sophia, C.B. answered the phone and seemed to be in a good mood, and that, when she arrived at the residence, C.B. never indicated there were any problems.

{¶50} On the other hand, Forbess testified to a different version of the incident. He testified that C.B. came into his room and sat on his bed; that he began rubbing her shoulders, and eventually they began kissing; that he then removed his shorts, and C.B. began rubbing his penis; that he ejaculated, but he did not know where his semen went; that he removed her clothing but decided he did not want to have sex with her; that the incident was consensual; and, that he never placed or attempted to place his finger or penis in her vagina.

{¶51} However, during Forbess' initial interview with the police, he was untruthful and indicated that he did not engage in sexual conduct or contact with

C.B., and that the semen on her sock must have been from her stepping on a towel in his room that contained semen. Additionally, Forbess did not change his story to indicate that he did engage in consensual sexual acts with C.B. until a few weeks before trial. Futhermore, Forbess' friend, Cory Hines, testified that Forbess told him to tell the police he was at his house at noon on the day of the incident, and Patrolman Green testified that he did not see a television in Forbess' bedroom, despite Forbess' testimony that he went upstairs on the day of the incident to watch television.

**{¶52}** It is clear from our review of the record that the testimony from Forbess and C.B. contained many questionable elements, with further evidence attacking the credibility of both. However, the juvenile court was in the best position to view the credibility of witnesses and chose not to believe the self-serving testimony of Forbess that the sexual acts were consensual. *In re Freed Children*, 3d Dist. Nos. 5-08-37, 38, 39, 40, 2009-Ohio-996, ¶35, citing *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. While we may have not reached the same conclusion, we cannot find that the juvenile court clearly lost its way such that the delinquency finding created a manifest miscarriage of justice.

**{¶53}** Accordingly, we overrule Forbess' third assignment of error.

*Assignment of Error No. IV*

**{¶54}** In his fourth assignment of error, Forbess argues that the juvenile court erred in applying R.C. 2152.83 to classify him as a Tier I sex offender. Specifically, Forbess asserts that R.C. 2152.83 violates his right to equal protection under the Ohio and United States Constitutions because it subjects offenders to mandatory or discretionary classifications depending upon their age at the time of the offense.

**{¶55}** "An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, paragraph one of the syllabus. "That presumption of validity of such legislative enactment cannot be overcome unless it appear[s] that there is a clear conflict between the legislation in question and some particular provision or provisions of the Constitution." *Xenia v. Schmidt* (1920), 101 Ohio St. 437, paragraph two of the syllabus.

**{¶56}** This Court has previously decided the question of whether R.C. 2152.83 violates the Equal Protection Clause, and we have found there to be no such constitutional violation. See *In re Messmer*, 3d Dist. No. 16-09-17, 2010-

Ohio-1088, ¶¶20-26. Accordingly, because we have found that R.C. 2152.83 does not violate the Equal Protection Clause, we are now bound to our prior decision by the principle of stare decisis. See *In re Copeland,* 3d Dist. No. 2009-Ohio-190, 1-08-40, ¶11.

*Assignment of Error No. V*

**{¶57}** In his fifth assignment of error, Forbess argues that he was denied the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective in failing to move to suppress his statements made during his initial interview with police; in failing to object to the admission of the videotaped interview with the police; in failing to object to the juvenile court's delinquency finding on one count of gross sexual imposition; and, in failing to object to his classification as a Tier I sex offender pursuant to R.C. 2152.83. We disagree.

**{¶58}** An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of

the trial. *State v. Waddy* (1992), 63 Ohio St.3d 424, 433, superseded by constitutional amendment on other grounds as recognized by *Smith*, 80 Ohio St.3d at 103.

{¶59} Additionally, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Malone* (1989), 2d Dist. No. 10564, 1989 WL 150798. "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" Id., quoting *Smith v. Murray* (1986), 477 U.S. 527. Furthermore, attorneys licensed by the State of Ohio are presumed to provide competent representation. *State v. Pierce,* 3d Dist. No. 11-09-05, 2010-Ohio-478, citing *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407. Accordingly, we must afford a high level of deference to the performance of trial counsel. *State v. Bradley* (1989), 42 Ohio St.3d 136, 142.

{¶60} Because we found in our disposition of Forbess' first, second, third, and fourth assignments of error, respectively, that Forbess' statements to Patrolman Green, as shown on the videotape submitted into evidence, were not involuntary and did not violate *Miranda* or R.C. 2151.352; that the juvenile court's delinquency finding was supported by sufficient evidence and was not against the manifest weight of the evidence; and, that the juvenile court did not violate his equal protection rights by adjudicating him a Tier I sex offender under

R.C. 2152.83, there can be no error or prejudice as a result of trial counsel's failure to object to these issues.

{¶61} Accordingly, we overrule Forbess' fifth assignment of error.

{¶62} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the juvenile court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**